**Gary GRIMM and Grimm Brothers Realty Company,**

v.

**Charles R. SWEENEY and Thomas M. O'Donnell.**

**Civil Action No. 01–431.**

United States District Court, E.D. Pennsylvania.

March 7, 2003.

Lloyd George Parry, Davis, Riter, Parry & Hartmann, Philadelphia, PA, for Plaintiff.

David J. Mac Main, Montgomery, McCracken, Walker & Rhoads, Michael J. Butler, Philadelphia, PA, for Defendant.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

Plaintiffs Gary Grimm ("Grimm") and Grimm Brothers Realty Company filed this civil action on January 26, 2001 seeking money damages and declaratory and injunctive relief under 42 U.S.C. § 1983 arising from alleged First Amendment retaliation, Fourteenth Amendment due process and state constitutional violations. On July 5, 2001, we granted the defendants' motion to dismiss those counts of the complaint alleging state claims against the defendants' municipal employer, the Borough of Norristown, and the plaintiffs' claim for declaratory and injunctive relief. Discovery was completed on December 5, 2001, after which both parties moved for summary judgment. Following oral argument on these motions, held February 13, 2002, we denied plaintiffs' motion and granted partial summary judgment for defendant on March 11, 2002. Remaining for trial were the plaintiff's claims that 1) the defendants acted in retaliation for the plaintiffs' exercise of their First Amendment rights of freedom of speech and freedom to file law suits; 2) the defendants acted in such a way as to violate the plaintiffs' substantive due process right to be free from arbitrary government action; 3) defendant O'Donnell acted in retaliation for plaintiff Gary Grimm's exercise of his Fourth Amendment right to refuse access to his property; and 4) the defendants' condemnations of 857 Cherry Street and 837 Swede Street violated Article I, Section 8 of the Pennsylvania Constitution. *Grimm v. Borough of Norristown,* 226 F.Supp.2d 606 (E.D.Pa.2002).

On October 22, 2002, the parties stipulated that all claims would be tried without a jury and before a judge, sitting alone, and we entered an order to that effect. We conducted a non-jury trial from November 20 through November 26, 2002, in Easton, Pennsylvania. Both parties waived their opening statements, and plaintiff called Gary Grimm ("Grimm") to begin the trial. After eliciting extensive testimony from Grimm on direct examination, plaintiffs' attorney agreed to let the defendants call two witnesses out of order. Thereupon, the defense called Kevin McKeon ("McKeon"), a Detective Lieutenant in the Borough of Norristown police department and the supervisor of defendant O'Donnell in his capacity as coordinator of a multi-jurisdiction crime and quality of life task force called the CLEAN team, and William Tims ("Tims"), a police Sergeant in the Borough of Norristown police department. Following the testimony of McKeon and Tims, Grimm resumed the stand. The plaintiffs also called Frank Scipione ("Scipione") as an expert witness on the interpretation of building codes; Joseph Epifanio ("Epifanio"), a former Borough of Norristown council president and mayoral candidate and member of the Norristown Initiative; William DeAngelis ("DeAngelis"), mayor of the Borough of Norristown; Richard Byler ("Byler"), a present director of the Norristown Initiative; Theodore Thompson, Esq. ("Thompson"), one of several attorneys who previously represented plaintiff Grimm in state court proceedings related to the condemnations and citations that are the subject of this case; defendant O'Donnell and defendant Sweeney. The defense called Robert Rosen ("Rosen") as their own expert; Paul Perry ("Perry"), the founder and Chief Executive Officer of the National Association of Investment Landlords ("NAIL I"); Dawn Castro ("Castro"), a former short-term employee of Grimm;

Mark Bernstiel ("Bernstiel"), an officer in the Montgomery County District Attorney's Office and the supervisor of the CLEAN team; Paul Van Grossi ("Van Grossi"), the Borough solicitor for the Borough of Norristown; plaintiff Grimm and both defendants.

In lieu of closing arguments, we ordered the parties to submit proposed findings of fact and briefs.[1] Based upon the parties' submissions, our evaluation of the evidence presented, and the credibility of the witnesses during the non-jury trial, we have made special findings of fact and conclusions of law. These are set forth more fully *infra*. *See* Fed.R.Civ.P. 52(a). We grant judgment for defendants on all claims presented by the plaintiffs.

## II. FINDINGS OF FACT

### *The Parties*

1. Plaintiff Grimm Brothers Realty owns six mixed-use properties in the Borough of Norristown. (11/20/02 tr. at 5; 11/21/02 tr. at 64). These include buildings at 202 Jacoby Street, 636 Cherry Street, 857 Cherry Street, 837 Swede Street, 839 Swede Street and 901 Swede Street (11/20/02 tr. at 31, 167; 11/21/02 tr. at 28, 65–66).

2. Grimm Brothers Realty has not received any citations at the 202 Jacoby Street, 636 Cherry Street or 901 Swede Street buildings during times relevant to this action. (11/21/02 tr. at 65).

3. Plaintiff Gary Grimm holds every corporate officer position of Grimm Brothers Realty. (11/20/02 tr. at 2). He also owns a property at 337 East Marshall Street in the Borough of Norristown. (11/20/02 tr. at 5).

4. Mr. Grimm is the public relations director of the Norristown Association of Investment Landlords ("NAIL II").

---

1. Our Order of November 25, 2002 directed that the plaintiffs were to file their proposed findings of fact and a supporting brief, to which defendants were to respond in kind, and finally to which plaintiffs would respond "with a sequentially numbered annotated and detailed response to any additional proposed findings of fact filed by Defendants setting forth at length all areas of agreement or disagreement." Plaintiffs blatantly failed to follow this direction. On January 16, 2003, the defendants filed a motion to strike the plaintiffs' Reply to Defendants' Proposed Findings of Fact and Brief in Support of Defendants' Proposed Findings of Fact and to deem the defendants' Proposed Findings of Fact admitted. We grant defendants' motion to the extent that the plaintiffs' Reply is stricken. However, we will not deem the defendants' proposed findings of fact admitted but will, pursuant to Fed.R.Civ.P. 52(a), conduct our own inquiry and make our own findings.

The plaintiffs' Reply to Defendants' Proposed Findings of Fact and Brief in Support of Defendants' Proposed Findings of Fact, filed January 13, 2003, does not comply with our post-trial Order in any fashion. First, it is not a sequentially numbered or annotated response. Indeed, it fails to respond to any of the defendants' proposed findings of fact by name or number. Second, it does not set out at all, let alone at length, any areas of disagreement between the plaintiffs' proposed findings and those of the defendants. Third, while the response is certainly detailed, the detail serves only to present arguments never presented to this court in any previous submission. These arguments include, *inter alia*, the claim that the continued condemnation of 837 Swede Street is an act of retaliation for Grimm's filing of a civil action against Sweeney alone on April 8, 2000. Until this filing, it has been plaintiffs' position that Sweeney acted in retaliation for several lawsuits filed against the Borough by NAIL I and the Norristown Initiative (NI) between 1994 and 1998. We are at a loss to understand why plaintiffs have waited until this late date to present this argument, but wait they have. We will not hear arguments never made to this court during trial. We therefore strike the plaintiffs' submission of January 16, 2003 in its entirety. We note that, even should we choose to consider the arguments raised in this filing, we would nevertheless find them without merit, as discussed *infra*.

(11/20/02 tr. at 6). NAIL II is a different organization from the National Association of Investment Landlords ("NAIL I"). (11/22/02 tr. at 194–195). NAIL I was incorporated in 1974, and NAIL II was formed in 1994 (11/22/02 tr. at 194, 199; 11/20/02 tr. at 6). Since late 1999 or early 2000, NAIL I has, through its director, requested that NAIL II cease using the acronym "NAIL" so as to avoid creating the impression that NAIL II is part of or affiliated with NAIL I. (11/22/02 tr. at 200). We do not find credible Grimm's claim that NAIL I merely changed its name to become NAIL II. (11/20/02 tr. at 6).

5. Mr. Grimm is also the Chair of the Civic Life Committee of the Norristown Initiative (NI). NI is an organization originally formed by the Montgomery County Commissioners to address civic issues in the Borough of Norristown. The Civic Life Committee of NI addresses issues of housing, code enforcement and crime. (11/20/02 tr. at 18).

6. Defendant O'Donnell is the Fire Chief, an Assistant Building Inspector for the Borough of Norristown and a member of the multi-jurisdiction CLEAN team. (11/22/02 tr. at 59–60;11/26/02 tr. at 20, 24–25)

7. Defendant Sweeney is the Fire Marshal, Code Enforcement Supervisor, Supervisor of the Fire Department and the Emergency Preparedness Coordinator of the Borough of Norristown. (11/22/02 tr. at 156–57).

### Basis of Claims of Retaliation for Exercising Right to Sue

8. NAIL I initiated several lawsuits from 1994 through 1997 against the Borough of Norristown, challenging the licensing fees assessed by the Borough. (11/22/02 tr. at 191–192; 11/20/02 tr. at 6, 8). Joining NAIL I in these lawsuits as plaintiffs were all of its 165 members, which included both corporate entities and individuals. (11/22/02 tr. at 192). Mr. Grimm and Grimm Brothers Realty were among these plaintiffs. (11/20/02 tr. at 7). The Norristown Initiative was not a party to the litigation. (11/21/02 tr. at 52).

9. We do not find credible Mr. Grimm's claim that the court challenges were organized by NAIL II. (11/20/02 tr. at 7). Indeed, Mr. Grimm, under cross-examination, admitted that his organization was not involved in the lawsuit. (11/21/02 tr. at 53). NAIL I initiated and organized these lawsuits. (11/22/02 tr. at 191–192). The leader of NAIL I at that time was its incorporator, founder and CEO, Paul D. Perry, who was the primary plaintiff. (11/21/02 tr. at 53; 11/22/02 tr. at 191,192).

10. The lawsuits initiated by NAIL I were settled favorably to the plaintiffs in December of 1999. (11/20/02 tr. at 10; 11/22/02 tr. at 193).

11. Mr. Grimm's direct involvement in the NAIL I lawsuits was peripheral at best. He had no contact with Van Grossi, the Borough Solicitor defending the Borough in the litigation, and neither he nor Grimm Brothers Realty as an entity was involved in any of the settlement negotiations. (11/22/02 tr. at 193; 11/25/02 tr. at 159). Paul D. Perry, the man known to Van Grossi as the lead plaintiff in the litigation and settlement negotiations, (11/22/02 tr. at 193; 11/25/02 tr. at 159), has extensive knowledge of both the substance of the legal issues involved in the law suits and of the contents of the sealed settlement agreements. (11/22/02 tr. at 193). Grimm's comparatively paltry knowledge of these matters, on the other hand, makes clear that his involvement was minimal. (11/20/02 tr. at 6–9).

12. Mr. Grimm was the public relations liaison for NAIL I during the lawsuits and had contact with the media regarding the

progress of the litigation. (11/20/02 tr. at 6; 11/22/02 tr. at 193).

13. O'Donnell did not know that Mr. Grimm or Grimm Brothers Realty were plaintiffs in any of the NAIL I lawsuits. (11/26/02 tr. at 20). Sweeney was aware of the NAIL I lawsuits in March of 2000 and was aware that Grimm and Grimm Brothers Realty were plaintiffs in those suits. (11/22/02 tr. at 157).

14. Defendants were not named parties in any of the law suits brought by NAIL I and plaintiffs. Sweeney testified at a deposition and performed some data-gathering activity for the Borough solicitor's office but was otherwise uninvolved in the litigation. (11/22/02 tr. at 157, 213). O'Donnell also testified at a deposition but was unaware of the content or details of the suits and was otherwise uninvolved in the litigation. (11/22/02 tr. at 60; 11/26/02 tr. at 20). Neither Sweeney nor O'Donnell had any role in answering pleadings, arguing the cases, participating in settlement negotiations or any other aspect of the litigation. (11/22/02 tr. at 213; 11/25/02 tr. at 158). Neither Sweeney nor O'Donnell was affected in any way by the settlement reached between the parties. (11/25/02 tr. at 158).

15. Perry has never felt he was retaliated against for his leading role in the NAIL I lawsuits by either O'Donnell or Sweeney. (11/22/02 tr. at 195). He has never felt he was retaliated against for being part of, or CEO of, NAIL I. (11/22/02 tr. at 196). He has never told anyone that he was targeted by code enforcement. (11/22/02 tr. at 197–98).

16. On April 6, 2000, Grimm Brothers Realty and tenants of 837 Swede Street brought an action in the Court of Common Pleas of Montgomery County challenging the condemnation of 837 Swede Street. The named defendants were the Borough of Norristown, Sweeney, Public Safety Director Russell Bono and Administrative Director Anthony Biondi. (Def.Exh.D–68). Sweeney knows he is a named defendant in that action. (11/22/02 tr. at 158). This action has not reached final resolution. (Def.Exh.D–68).

### The Basis for Claims of Retaliation for Exercising Right to Criticize Borough

17. NI has organized monthly cable broadcasts of public fora that address issues in the Borough. Mr. Grimm invited Defendant Sweeney to appear at one of these fora and make a presentation on the expansion of the code enforcement office. (11/20/02 tr. at 27).

18. Defendant O'Donnell did not know Grimm was a member of NI, nor even that NI existed. (11/26/02 tr. at 21). While O'Donnell was on the board of the fire department, the department hosted monthly or bi-monthly meetings of NAIL II at the firehouse because NAIL II's normal meeting place, 837 Swede Street, was condemned. (11/21/02 tr. at 53–54; 11/26/02 tr. at 21).

19. Defendant Sweeney accepted Mr. Grimm's invitation to make a presentation without reservation. (11/22/02 tr. at 212). We do not find credible Mr. Grimm's claim that Sweeney was reluctant to appear and made negative comments about his appearance. (11/20/02 tr. at 27).

20. Mr. Grimm made public comments critical of the code enforcement policies of the Borough beginning only in 2001. (11/20/02 tr. at 37).[2] The earliest such

2. Grimm testified that, as public relations director for NAIL II, he wrote a letter some time in the year 2000 to the mayor and Borough council objecting to a property tax increase. (11/20/02 tr. at 12–14). However, this letter is not in evidence and even Grimm

statements were made by Mr. Grimm in a newspaper article dated November 29, 2001 about his challenge to the use of county district attorneys to prosecute Norristown building code violations. (11/20/02 tr. at 38–39; Pl. Exh. P–3).[3] Prior to his statements in the newspaper, Mr. Grimm's public comments regarding Borough policy had been restricted to attempts to obtain and disseminate the Borough building codes and general laws through his position as chairman of the NI Civic Life Committee. (11/20/02 tr. at 18–25; Pl. Exh. P–1, P–2; *See* Findings of Fact ¶ 21).[4] Even Mr. Grimm characterizes his activities prior to the condemnation of 837 Swede Street not as "direct criticism" but rather as an effort to obtain and disseminate to the public the Borough building codes. (11/26/02 tr. at 125). Mr. Grimm made a public presentation to the Borough counsel on January 15, 2002 in which he criticized many Borough policies, including some of those related to code enforcement. (11/20/02 tr. at 39–40; Pl. Exh. P–4). The Borough council studied Mr. Grimm's complaints and issued its findings in a report dated April 9, 2002. (11/20/02 tr. at 41; Pl. Exh. P–6). This report, while critical in some aspects of the code enforcement bureau, does not criticize it on the basis of intentional bias or selective enforcement. (Pl.Exh.P–6).

21. We find that Mr. Grimm did not have a prominent role in NI's attempts to obtain the Borough codes and general laws. Epifanio was initially responsible for obtaining the general laws. (11/20/02 tr. at 19; 11/21/02 tr. at 165). Mayor DeAngelis attempted to put the general laws on a website completely unconnected to NI, and was aided by someone other than Grimm in that effort. (11/21/02 tr. at 175). Neither O'Donnell nor Sweeney has any responsibility over the general laws of Norristown. (11/21/02 tr. at 176). Grimm and Byler collaborated in their efforts to obtain the Borough codes and the Borough is cooperating in that effort. (11/21/02 tr. at 182).

### 837 Swede Street Condemnation

22. Grimm Brothers Realty's 837 Swede Street Property was built approximately 150 years ago. (11/20/02 tr. at 48). It houses residential apartments on its second and third floors, commercial space on its first floor and a commercial/light industrial/warehouse space in its basement. (11/20/02 tr. at 48–50).

23. On March 7, 2000, 837 Swede Street suffered a major fire. (11/22/02 tr. at 204).

24. Sweeney was called to the fire at 4:00 A.M. When he arrived, the fire had been extinguished and Sweeney aided the fire fighters in the investigation of the cause of the fire. (11/22/02 tr. at 204). O'Donnell was called in to help fight the fire at 2:00 or 3:00 A.M., when he was already in bed, and he commanded the roof section of the fire-fighting effort. (11/26/02 tr. at 21). O'Donnell knew when he received the call that the burning building was owned by Grimm Brothers Realty,

---

cannot recall whether it also criticized code enforcement policies. (11/20/02 tr. at 13–14). In any event, there is no evidence that either defendant knew of the letter or that it was ever made public.

**3.** The statement that apparently prompted this article was also posted on NAIL II's website by Mr. Grimm on November 27, 2001. (Pl.Exh.P–7).

**4.** NI operates a website on which Grimm has, at unspecified times, posted comments critical of code enforcement. (11/20/02 tr. at 15). These comments are not in evidence, and there is no evidence to suggest that either defendant was aware of them.

but he had no hesitation about helping to fight the fire. (11/26/02 tr. at 22).

25. The fire severely damaged apartment two, the roof over apartment two and, in combination with the water used to combat it, the entire building's electrical system. (11/20/02 tr. at 52–53; Def.Exh.D–29, p. 10). The electric power to the building was shut off as a precaution on the orders of Fire Chief John DiNofi, and on March 7, 2000, Sweeney, acting as Fire Marshall, condemned the building for reasons of public safety. (11/22/02 tr. at 205, 206; Def.Exh.D–29, p. 19).

26. Sweeney's decision to condemn 837 Swede Street was reasonable, justified and not based on any retaliatory motive against Grimm or Grimm Brothers Realty. (11/21/02 tr. at 107; 11/22/02 tr. at 123; 11/22/02 tr. at 213).

27. Sweeney's letter of March 7, 2000 notified Mr. Grimm of the condemnation but did not indicate what would be required to lift the condemnation. (Def.Exh.D–29, p. 20).

28. On March 13, 2000, Sweeney notified Mr. Grimm by letter that, in order for the building's electric power to be restored, Mr. Grimm would have to provide a certificate from an electrical underwriter that the building's entire electrical system was safe. (Def.Exh.D–29, p. 26). Sweeney's letter required that the entire electrical system, from the basement to the upper floors, be inspected and certified. (11/25/02 tr. at 16). We do not find credible Mr. Grimm's claim that the first time he understood that Sweeney was requesting certification of the entire electrical system, as opposed to only a portion thereof, was at trial when he was presented with this letter by his counsel. (11/20/02 tr. at 68; 11/21/02 tr. at 69).

29. In addition to the electrical certification, the March 13, 2000 letter also informed Mr. Grimm that in order to lift the condemnation, 1) he would be required to ensure that the individuals living in apartment number four were not comprised of more than three unrelated persons; 2) the apartments would need to be inspected to ensure damaged doors and windows had been properly repaired and fire extinguishers and smoke detectors were fully operational; 3) the basement area would need to be cleared of combustible and flammable materials or entirely separated from the first floor by a two-hour fire separation; and 4) a list of businesses operating out of the first floor, with contact information, would have to be provided to the Borough. (Def.Exh.D–29, p. 26). It is standard procedure for Sweeney to provide a written list of all the conditions that must be corrected to lift a condemnation imposed after a fire. (11/22/02 tr. at 208–09).

30. The electrical inspection by Gambino Electric, Inc. conducted on March 7, 2000 did not certify the safety of the entire electric system because it did not cover any apartment other than apartment two. (11/25/02 tr. at 17; Def.Exh.D–29, p. 189). Similarly, their inspection on March 17, 2000 only covered one house panel. (11/25/02 tr. at 111; Def.Exh.D–63).

31. The inspection by the Middle Department Inspection Agency of Gambino Electric, Inc.'s work on March 9, 2000 did not certify the safety of the entire electric system because, as an underwriter, MDIA could only inspect the work Gambino had actually performed, which did not cover the entire building. (11/20/02 tr. at 57; 11/25/02 tr. at 17, 44–45, 46–47; Def. Exh.D–29, p. 190). No cut-card by MDIA verifying the safety of the entire system was received into evidence. (11/25/02 tr. at 45–46).

32. Grimm knew as of March 14, 2000 that the Borough had not yet received a cut-card verifying the entire electrical sys-

tem because he was so informed by Sweeney by letter on that date. (11/20/02 tr. at 72; 11/22/02 tr. at 211; Def.Exh.D–29, p. 28). Sweeney's letter did not change or alter the conditions which Grimm needed to meet in order to have the condemnation lifted—it clarified that the remaining outstanding issues were the lack of a full-system electrical certification and the need to either remove all combustibles from the basement, in which case the need for a two-hour fire-rated separation would be eased, or install a two-hour fire-rated separation. (11/22/02 tr. at 211; Def.Exh.D–29, p. 29).

33. Sweeney warned Mr. Grimm that the Borough council candidate forum scheduled by NI for March 15, 2000 would have to be moved because the building remained condemned. (11/22/02 tr. at 211–12; Def.Exh.D–29, p. 29). He issued this warning not out of any desire to harm or punish NI or Grimm as a member of NI but rather because he did not want to inconvenience Borough council candidates who would be appearing for the meeting, given that they might soon be taking office. (11/22/02 tr. at 212, 214).

### 837 Swede Street Continued Power Shut-off Issues

34. On or about March 15, 2000, Grimm illegally tapped power from 839 Swede Street, through the use of extension cords and jumpers from one electrical box to another, for use at 837 Swede Street. (11/20/02 tr. at 69–70; 11/22/02 tr. at 208). Sweeney wrote Grimm a letter the same day warning him that this was illegal and that if he was found jumping the electrical power from 839 to 837 Swede Street again, power would be completely disconnected.

(11/22/02 tr. at 208; Def.Exh.D–29, p. 30). Grimm, on behalf of Gambino Electric, applied for and received a permit to install a temporary 200 amp work panel, for the purpose of powering electrical equipment needed to repair 837 Swede Street, the very same day. (11/20/02 tr. at 100; 11/22/02 tr. at 208; Def.Exh.D–29, p. 30, 147, 148). This panel was allowed so that Grimm could perform necessary repairs, not for the purpose of powering apartments for tenants, and the permit specifically states that the work panel may not be augmented. (11/25/02 tr. at 18, 19; Def. Exh.D–148). Sweeney wrote to Tony Bazzani, an Operations Planning & Analysis manager at PECO Energy Company, on May 18, 2000 to inform him that Grimm had been found jumping electric from 839 Swede to 837 Swede, that a temporary panel had been permitted for 837 Swede and that despite this situation, 837 Swede remained condemned and power to it should remain off. (11/25/02 tr. at 20; Def. Exh.D–29, p. 55).[5]

35. On September 15, 2000, a PECO technician called Sweeney to tell him that he was attempting to check the meters at 837 Swede Street but that a truck had been parked in front of the meters. (11/25/02 tr. at 24). Sweeney went to the property and found that there was indeed a truck blocking the meters. (11/25/02 tr. at 24; Def.Exh.D–29, p. 115–16). He also discovered that in addition to the meter for the single permitted temporary work panel, someone had installed an additional four meters that were powering the apartments in the building. (11/25/02 tr. at 24–25; Def.Exh.D–29, p. 116). Neither the Borough nor PECO had any knowledge of

---

**5.** Although the letter Sweeney wrote to Bazzani includes hearsay statements in that it recounts what Lynne Bixler told Sweeney she found Grimm doing, it is mentioned here as evidence of Sweeney's state of mind in writing this letter. In addition, we note that Grimm himself admits that he was, in fact, jumping electric from 839 to 837 Swede. (11/20/02 tr. at 69–70).

these four meters. (11/25/02 tr. at 26). Sweeney ordered PECO to remove the meters. (11/25/02 tr. at 26–27). PECO issued shut-off orders on September 18, 2000 and cut power to all four meters. (11/20/02 tr. at 148; Def.Exh.D–29, p. 105–07). Sweeney visited the property again on September 19, 2000 and verified that the meters had been removed. (11/25/02 tr. at 26; Def.Exh.D–29, p. 111–12, 151). Sweeney did not order the meters shut off out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits, Grimm's suit to lift the condemnation of 837 Swede Street or Grimm's public comments regarding Borough code enforcement policies, but rather because he knew that their installation was illegal. (11/25/02 tr. at 26, 78).

36. The power to the temporary work panel installed on March 15, 2000 was cut on or about October 11, 2000. (11/20/02 tr. at 149). The electrical power was terminated because Mr. Grimm's permit for a temporary work panel had expired. (Pl. Exh.P–91). Sweeney did not order PECO to terminate either the electricity or the gas to 837 Swede Street on October 11, 2000. (11/25/02 tr. at 77; Def.Exh.D–29, p. 149).

37. Electrical underwriters deliver cut-cards verifying their inspections to the building inspector, not to Sweeney. (11/25/02 tr. at 60). Sweeney forwarded all of Grimm's correspondence regarding the electrical system to Lynn Bixler and responded to it based on what she told him. (11/25/02 tr. at 60, 76, 77–78). The authority to order the building's power turned back on rested with Lynn Bixler, not with Sweeney. (11/25/02 tr. at 63, 64, 67). His responses to Grimm's correspondence, that the Borough had not received any cut-card verifying the entire electrical system, were based on what Lynn Bixler told him. (11/25/02 tr. at 67). To the extent that he ever stated that he thought the electrical issues had been resolved, (11/25/02 tr. at 63; Pl Exh. P–59, p. 24), he was basing the information on what he thought Lynn Bixler had told him. (11/25/02 tr. at 63, 64).

38. In fact, defendant Sweeney did not receive notification that the Middle Department Inspection Agency had provided an electrical cut-card verifying the entire electrical system to the building inspector until November 27, 2000. (11/25/02 tr. at 28; Def.Exh.62).[6] We do not find credible Mr. Grimm's testimony that MDIA informed him that it had transmitted a cut-card certifying the entire electrical system to the Borough before that time (11/20/02 tr. at 59, 69–70; Def.Exh.D–29, p. 27).[7]

39. Sweeney acted within a reasonable time after hearing from Bixler to inform PECO and Mr. Grimm by letter dated December 16, 2000 that the electric power could be restored to the building. (11/25/02 tr. at 60; Def.Exh.29, page 151). By a letter dated December 19, 2000, defendant Sweeney reminded Mr. Grimm within a reasonable time that he would be required to contact PECO directly to have the power and gas restored to the building; he acted out of a concern that Mr. Grimm might not realize that action on his part

6. MDIA issued a certificate certifying the electrical system on October 30, 2000, (Def.Exh.D–62). However, the certificate was never provided to Sweeney (it was resurrected from MDIA's records) and, in any event, is not the equivalent of a cut-card. (11/25/02 tr. at 42). Cut cards are typically provided to the Borough only after the issuance of such a certificate. (11/25/02 tr. at 42).

7. Grimm's testimony on this issue is hearsay. Even if we believed Grimm, and we do not, it would not bear on whether the Borough had actually received a cut-card.

was required. (11/25/02 tr. at 29–30; Def. Exh.29, page 155). Mr. Grimm had, in fact, already requested that PECO restore power by a letter dated December 16, 2000. (Def.Exh.D–29, p. 154).

40. Sweeney did not terminate the power to 837 Swede Street or keep the power from being restored out of a desire to retaliate against Grimm or Grimm Brothers Realty for the NAIL I lawsuits, Grimm's suit to lift the condemnation or Grimm's public comments about code enforcement policies. (11/25/02 tr. at 30). His decision was based on safety concerns. (11/25/02 tr. at 61).

41. Sweeney had no role in the termination of gas service to 837 Swede Street. (11/25/02 tr. at 77).

### 837 Swede Street—August 30, 2000 Settlement Negotiations

42. Grimm challenged the condemnation at an administrative appeal hearing on or about April 4, 2000, which he lost. (11/20/02 tr. at 110–112).

43. He then brought an action on April 6, 2000 in the Court of Common Pleas for Montgomery County to lift the condemnation. (Def.Exh.D–68).

44. Grimm filed a motion for a temporary injunction lifting the condemnation, which was heard on May 25, 2000 before Judge Calvin S. Drayer, Jr. (11/21/02 tr. at 47; 11/25/02 tr. at 160; Def.Exh.D–64). Grimm presented his side of the issues fully. (11/25/02 tr. at 160).[8] The judge denied Grimm's motion because he found that he was unlikely to succeed on the merits. (11/25/02 tr. at 160).

45. Grimm filed a second motion for a temporary injunction lifting the condemnation. This motion was heard by Judge Albert R. Subers on July 17, 2000. (11/21/02 tr. at 51; 11/25/02 tr. at 161; Def.Exh.D–64). Grimm had a full opportunity to present witnesses and evidence at this hearing. (11/25/02 tr. at 161).[9] As with the previous motion, Judge Subers denied Grimm's motion. (11/21/02 tr. at 51).

46. Grimm filed a third motion for a temporary injunction on August 29, 2000. (Def.Exh.D–68). This motion has not yet been heard. (11/25/02 tr. at 161).

47. On August 30, 2000, Van Grossi and Grimm's then-counsel Theodore Thompson, Esq. held a conference in chambers with Judge Richard L. Lowe. (11/22/02 tr. at 6; 11/25/02 tr. at 162–63). At that conference, Thompson was provided three options which would allow the condemnation to be lifted: 1) give up the use of the basement space as a warehouse/shop permanently, 2) install a sprinkler system in the basement, or 3) install a two-hour fire-rated separation between the basement and the first floor. Any plan to install a sprinkler system would require detailed drawings and approval by the Fire Marshall, defendant Sweeney. Similarly, a plan to install a two hour fire-rated separation would require the submission of plans and approval by Sweeney. (Def.Exh.D–10).

48. Thompson told Van Grossi that his client would agree to installing a sprinkler system and would present the necessary paperwork to the Borough and complete

---

8. Grimm claims that he had as many as ten witnesses prepared to testify who were not given the chance to do so. (11/21/02 tr. at 49–50). There is no evidence of this in the transcript of the hearing. (*See* Pl.Exh.P–59).

9. There is no evidence that Grimm was prevented from testifying or presenting witnesses at this hearing either. (Def.Exh.D–64, p. 2).

Grimm himself testified at length at the hearing. (Def.Exh.D–64, p. 3–60, 133–48). There is similarly no evidence to support Grimm's claim, (11/21/02 tr. at 50), that Sweeney shifted the grounds for the condemnation at this hearing. Even if he had, Grimm had a full opportunity to cross-examine Sweeney. (Def.Exh.D–64, p. 118–33).

the installation in a timely fashion. (11/22/02 tr. at 10; 11/25/02 tr. at 162).

49. The agreement reached between the Borough and Grimm was that Grimm would submit the necessary paperwork detailing how the sprinkler system would be installed, that once his plan was approved by Sweeney he would install the sprinkler system, and at that point the condemnation order would be lifted. (11/25/02 tr. at 162, 166–67). No agreement was made that a simple commitment to install a sprinkler system, made that day by Grimm through counsel, would result in the lifting of the condemnation. (11/25/02 tr. at 163).[10]

50. Within moments after the meeting between his counsel and the Borough, Grimm attempted to alter the arrangement in conversation with Van Grossi. (11/25/02 tr. at 164). According to Thompson, "there's always a lot of back and forth with Gary" and Grimm was "tweaking" the agreement, whereas the Borough's position was constant. (11/22/02 tr. at 11, 14–15).

51. Grimm knew perfectly well that no agreement to lift the condemnation had been reached. His fax to Van Grossi on August 31, 2000, (Def.Exh.D–9), included two options, rather than the one his attorney had represented Grimm had agreed to, and neither was identical to the one Thompson had agreed to on his behalf.

This fax is, in fact, styled as an agreement and has a space for Van Grossi's signature on behalf of the Borough; neither Van Grossi nor any other representative of Norristown ever signed Grimm's fax, and Grimm therefore must have known that no agreement had been reached. (11/25/02 tr. at 165). Grimm was also notified, through his attorney Thompson, that whatever Grimm thought the arrangement was, as expressed in his August 31, 2000 fax, it was not the same as Van Grossi's understanding. (11/21/02 tr. at 81; 11/22/02 tr. at 17; Def.Exh.D–10).[11] In fact, Thompson told Grimm that "if he just left [the agreement] alone, and went ahead with the sprinkler system commitment, ... the condemnation *would be lifted.*" (11/22/02 tr. at 17 (emphasis supplied)).[12] Thompson did not move to enforce the agreement because negotiations as to the sprinkler specifications were ongoing. (11/22/02 tr. at 12). Grimm knew that an order entering the agreement would be required, given that he had previously visited the courthouse looking for just such an order. (11/26/02 tr. at 91).

### 837 Swede Street—September 20, 2000 Citation for Holding a Meeting in Condemned Building

52. On September 20, 2000, O'Donnell was driving by 837 Swede Street on his

10. Sweeney's statement at the May 25, 2000 hearing that "if he would give us a letter, we would lift the condemnation as long as he was working with us," (Pl.Exh.P–59, p. 67:16–23), has no bearing on the agreement reached on August 30, 2000. It is obvious from the context of the statement that Sweeney is describing an earlier offer made to Grimm at the April 4, 2000 administrative appeals hearing. In addition, Sweeney's statement was more than three months before the agreement was reached between Van Grossi and Thompson and is not descriptive of that agreement.

11. Van Grossi contacted Thompson on August 31, 2000 and September 5, 2000 to clarify that the condemnation had not been lifted and that Grimm's version of the agreement was not consonant with his own. (11/25/02 tr. at 165, 168; Def.Exh.D–10, D–11). Given that Van Grossi's fax of September 5, 2000 clearly states that after Grimm's plan was approved, "a Court Order would be entered confirming the agreement," it is clear that Thompson knew the condemnation had not been lifted. Thompson never responded to these letters. (11/22/02 tr. at 22; 11/25/02 tr. at 168).

12. We do not find credible Grimm's claim, (11/21/02 tr. at 81), that Thompson told him the condemnation had already been lifted after discussing Van Grossi's August 31, 2000 fax.

way home when he noticed that there were people entering the building. (11/26/02 tr. at 59).[13] He contacted his CLEAN team supervisor, Detective Lieutenant Kevin McKeon of the Norristown police department. (11/20/02 tr. at 79; 11/26/02 tr. at 59). McKeon happened to be in the neighborhood and decided to handle the call personally. (11/20/02 tr. at 79). McKeon and O'Donnell both knew the building was still condemned as of that date. (11/20/02 tr. at 80; 11/26/02 tr. at 50). McKeon and O'Donnell discovered that Grimm was in the middle of conducting a meeting. (11/20/02 tr. at 80–81; 11/22/02 tr. at 50). McKeon had no idea what the meeting was about or which organization was conducting it. (11/20/02 tr. at 82).[14] As O'Donnell's supervisor, McKeon ordered him to write a non-traffic citation to Grimm for allowing people to occupy a condemned building. (11/20/02 tr. at 81, 83; 11/22/02 tr. at 50). McKeon also asked everyone to vacate the building and the meeting participants did so "very nice[ly]" and, with one exception, without objection. (11/20/02 tr. at 82 83; 11/21/02 tr. at 168, 171).

53. We do not credit Grimm's claim that he believed the condemnation had been lifted as a result of the August 30, 2000 conference between Van Grossi and Thompson. In particular, we do not find credible his claim that Thompson only shared Van Grossi's September 5, 2000 fax, (Def.Exh.D–11), which clearly states that the condemnation has not been lifted, some time after September 20, 2000.

(11/21/02 tr. at 82). In any event, the condemnation was still in effect on September 20, 2000. (*See* Findings of Fact ¶¶ 49–51).

54. O'Donnell did not issue the citation for allowing a condemned building to be occupied out of a desire to retaliate against Grimm or Grimm Brothers Realty for their participation in the NAIL I lawsuits or against Grimm for his public comments regarding code enforcement policies. He issued the citation because his supervisor directed him to, because he knew the building was condemned and because it was clear that Grimm was allowing it to be occupied. (11/26/02 tr. at 50).

### *837 Swede Street—September 26, 2000 Citation for Allowing Tenants to Occupy a Condemned Building*

55. Dawn Castro was hired by Grimm in June of 2000 to perform various duties for Grimm Brothers Realty. (11/25/02 tr. at 114, 120). She worked for him for three days. (11/25/02 tr. at 114, 120). Grimm asked Castro, who is fluent in Spanish, (11/25/02 tr. at 114), to act as a translator between him and several Spanish-speaking tenants. (11/25/02 tr. at 118). Grimm asked Castro to tell at least one family that they could move back into 837 Swede Street (from the Colonial Hotel, where they had been staying since the fire, (11/25/02 tr. at 121)) but that if anyone asked them, they were to say that Grimm did not know they were living there.

---

**13.** Although Epifanio testified that O'Donnell told him later that the 837 Swede Street was being watched by the police, we do not credit this testimony. (11/21/02 tr. at 169). O'Donnell never told Epifanio that the building was under surveillance, and the building was not under surveillance. (11/20/02 tr. at 82; 11/26/02 tr. at 54). In fact, as Grimm himself admitted, he made no secret of the fact that he was opening up 837 Swede Street for use and even publicly advertised the September 20, 2000 NI meeting. (11/26/02 tr. at 118).

Finally, even if it were the case that the building were under police surveillance, it would have no bearing on the issues in this case, namely, whether O'Donnell acted in such a way as to violate Grimm's or Grimm Brothers Realty's constitutional rights.

**14.** The gathering was a regular meeting of the Civic Life Committee of the Norristown Initiative. (11/20/02 tr. at 157).

(11/25/02 tr. at 118). Castro witnessed these tenants moving their belongings into 837 Swede Street that day and understood that they were going begin living there again. (11/25/02 tr. at 118, 121).

56. Castro's other duties required her to work inside 837 Swede Street. There were boards over some of the ground floor windows, and Grimm told her to stay away from the windows because he was not supposed to be inside the building. (11/25/02 tr. at 119). Grimm described the building's continued condemnation as "some technicality." (11/25/02 tr. at 119). We do not find credible Grimm's statement that "I have no idea where she got [her statements regarding what Grimm asked her to interpret] from. There is nothing that would be of the intent of what she is trying to say that I can in any reason justify me making a statement like that." (11/26/02 tr. at 118).

57. On September 26, 2000, when O'Donnell had failed to find Mr. Grimm at a rescheduled inspection for 857 Cherry Street, (see Findings of Fact ¶ 125), he went to 837 Swede Street to find him. (11/26/02 tr. at 51). After knocking on the door, O'Donnell noticed that another code officer, Rob Durant, had pulled up to the curb. (11/26/02 tr. at 61). O'Donnell spoke to him briefly and then went around to the side door to see whether Grimm was in his office. (11/26/02 tr. at 61). While O'Donnell was at the door to Grimm's office, Durant observed tenants entering through the front door. (11/26/02 tr. at 52, 62). At that point, other code enforcement officers were called and they entered the building and took photographs. (11/26/02 tr. at 52, 62). If the tenants were ordered out of the building by 5 p.m., O'Donnell had nothing to do with that order being given. (11/26/02 tr. at 62–63).

58. Later in the day, Sweeney asked O'Donnell to return to the property with PECO and members of the CLEAN team and stand by while the power was terminated to the apartments. (11/26/02 tr. at 52–53, 62). It was at that point that O'Donnell and Sergeant William Tims, his supervisor on the CLEAN team that day, realized that there were still tenants in the building. (11/26/02 tr. at 63). Tims ordered O'Donnell to find them alternative housing, which he did by calling various landlords he knew as well as the Red Cross. (11/20/02 tr. at 90; 11/26/02 tr. at 63). O'Donnell chose to call David Sarini (ph), the vice-president of NAIL and a Norristown landlord, not to "send a message" but rather because he wanted to find alternative housing for the displaced tenants, who included a pregnant woman among them. (11/26/02 tr. at 64). We do not find credible Grimm's claim that he had to find alternative housing for three families (11/26/02 tr. at 107).

59. Tims and O'Donnell both entered 837 Swede when they realized that there were still tenants inside. They inspected the residential units and discovered two families living in each of apartments three and four. (11/20/02 tr. at 85–86). One family was cooking dinner (11/20/02 tr. at 86–87). It was clear to both Tims and O'Donnell, as it is to us, that people were living in both apartments. (11/20/02 tr. at 86, 87–90; 11/26/02 tr. at 53; Def.Exh.D–40). Tims knew the building remained condemned. (11/20/02 tr. at 89). He therefore ordered O'Donnell to write a non-traffic citation for Grimm Brothers Realty for allowing a condemned building to be occupied. (11/20/02 tr. at 89–90; 11/26/02 tr. at 53). O'Donnell issued a citation to Grimm that day, of which Grimm was found guilty by a district justice on October 17, 2000. (11/26/02 tr. at 53; Def.Exh.D–42).

60. Grimm knew that tenants were living in apartments at 837 Swede Street on September 26, 2000. (11/21/02 tr. at 83).

In fact, he told them that the condemnation had been lifted even though he knew that it had not. (11/21/02 tr. at 83).[15] Grimm admits that he started renting out apartments at 837 Swede Street in August in anticipation of reaching an agreement on August 30, 2000. (11/20/02 tr. at 163–64). By September, he knew that some of the displaced tenants had moved back into the building. (11/20/02 tr. at 163.) In fact, at least one tenant had moved back in on August 30, 2000. (11/26/02 tr. at 110). The reason Grimm did not go to 837 Swede Street while the code enforcement officers were there is because he knew that he was illegally allowing tenants to occupy the building.[16]

61. O'Donnell did not write the citation for the purpose of retaliating against Grimm or Grimm Brothers Realty for their role in the NAILS I lawsuits or for Grimm's public comments regarding code enforcement policies. Instead, he wrote the citation because he knew the building was condemned and there were people illegally living in it. (11/26/02 tr. at 53).

### 837 Swede Street—The Sprinkler Plan

62. Grimm never submitted a complete or satisfactory sprinkler plan to the Borough. Although he made several attempts, (11/20/02 tr. at 147; 11/22/02 tr. at 49–50; Def.Exh.D–29, p. 80, 89), he repeatedly ignored Sweeney's detailed responses to each attempt as to what would be required to obtain approval. (11/22/02 tr. at 54, 238–239; Def.Exh.D–29, p. 88, 98, 130). Grimm was not dealing in good faith from the very beginning; when he submitted his first sprinkler plan, he designed it for the purpose of the Borough "saving face." (11/22/02 tr. at 146).

63. It was not ultimately Sweeney's decision whether the sprinkler plan met the required codes. Sweeney submitted all sprinkler plans to All States Design, a state-certified engineering company that reviews fire suppression system plans. (11/22/02 tr. at 240–41, 242). Because All States Design charges the Borough for every request to review such plans, Sweeney could not submit Grimm's incomplete or facially unsatisfactory proposals for review. (11/22/02 tr. at 240–41).

64. Usually, landlords will utilize the services of an expert contractor knowledgeable in the design of National Fire Protection Association pamphlet–13 (NFPA–13) compliant systems. (11/22/02 tr. at 240). Grimm has no expertise in sprinkler system design. (11/22/02 tr. at 54–55). Although Grimm claims to have hired someone with experience designing sprinkler systems to help him prepare his applications, we do not believe that this person had the necessary expertise.[17]

---

**15.** In this regard, we do not find credible Grimm's claim that he only learned of Van Grossi's September 5, 2000 fax, which makes clear that the condemnation has not been lifted, after September 26, 2000. (11/21/02 tr. at 81). He had been told as recently as September 20, 2000 by Lt. McKeon that the building remained condemned. (11/20/02 tr. at 165).

**16.** Grimm knew that the police and code enforcement officers were at 837 Swede Street because he drove by while they were there. Rather than stopping to find out exactly what was happening and to offer his assistance, as a responsible landlord would, Grimm drove to another property and listened to a police scanner intercepting police radio transmissions. (11/21/02 tr. at 162). The reason he felt "uncomfortable" with all the police activity at 837 Swede Street, (11/26/02 tr. at 105), was because he knew that he had allowed tenants illegally to occupy a condemned building.

**17.** We are also incredulous of Grimm's account of exactly who this person was. At first, Grimm stated that he did not "care to give the name" of this contractor because he is in business within the Borough of Norristown. (11/22/02 tr. at 55). Then, under pressure from the Court, he revealed that the contractor's first name was "George" but

65. Sweeney did not refuse Grimm's applications for approval of his sprinkler design out of a desire to retaliate against Grimm because of his involvement in the NAIL I lawsuits, his suit to lift the condemnation or because of his public comments regarding code enforcement. (11/22/02 tr. at 242–43). Instead, he could not approve Grimm's proposals because Grimm never sent a complete or satisfactory plan that could be reviewed by All States Design. (11/22/02 tr. at 241–42).

### 837 Swede Street—October 4, 2001 Citations for Allowing Tenants to Occupy a Condemned Building and for Using Extension Cords as a Permanent Source of Power

66. In early October 2001, Detective Bernstiel, in his capacity as coordinator of the CLEAN team and a detective in the Montgomery County Detectives Office, received a complaint from a woman named Julia De La Cruz Lopez that she and several other tenants were occupying a condemned building at 837 Swede Street. On October 3, 2001, Bernstiel drove to 837 Swede Street and, from an alley behind the building, observed lights on in at least one window and the flicker of a television through another window. (11/25/02 tr. at 129). This substantiated his belief that there were people living illegally in the building. (11/25/02 tr. at 130). The following day, he took a statement from Lopez and collected some documents from her. (11/27/02 tr. at 130).

67. Based on his interview with Lopez, Bernstiel told O'Donnell and Sweeney that he had been told by a complainant that there were people living at 837 Swede Street and paying rent to Grimm, that there were electrical extension cords being

used to provide power to the apartments, which Bernstiel believed to pose an immediate hazard, and that there were children living in the building. (11/25/02 tr. at 134). Bernstiel also told them that he wanted, on this basis, to conduct an immediate inspection using the CLEAN team at 837 Swede Street. (11/25/02 tr. at 135).

68. Bernstiel, Sweeney, O'Donnell and members of the CLEAN team conducted an inspection on October 4, 2001. (11/25/02 tr. at 137; 11/26/02 tr. at 55). They discovered extension cords lying haphazardly throughout the upper hallway, leading into each of the three apartments. The main cord powering the extension cords was coming from apartment two. It was an improperly constructed male-male cord, plugged into a junction box in the hallway. This was extremely dangerous, as only unplugging one end would leave the cord powered and, because of the exposed contacts on that unplugged male end, capable of delivering a shock very easily. (11/25/02 tr. at 37, 139; Def.Exh.D–29, p. 174–75, 177–78). In both apartments two and three, the cords were powering electrical devices such as a box fan, a microwave oven, clock radios, lights, a convection oven, radiators and televisions (11/25/02 tr. at 36, 137; Def.Exh.D–29, p. 176, 181–82, 184). In addition, in both apartments, there were other clear signs of people living there, including made beds, fresh food, pans in the sink, couches and chairs. (11/25/02 tr. at 37–38; Def.Exh.D–29, p. 171, 173, 179–81). Indeed, in at least one apartment, there was cooking actually being done by the family that lived there while the inspection was going on. (11/25/02 tr. at 38). There was no answer at apartment one, but extension cords en-

---

claimed not to remember his last name. (11/22/02 tr. at 57). Under further pressure, Grimm explained that he could not remember the full name because "it was a mutual ac-

quaintance of a friend of mine." (11/22/02 tr. at 58). Eventually, Grimm revealed that the contractor's name was George L. Church, Jr. (11/22/02 tr. at 75).

tered the apartment under the front door. (Def.Exh.D–29 at 187–88).

69. In addition, there was tar paper over the windows in apartment two. (11/25/02 tr. at 37, 137, 143–44; Def. Exh.D–29, p. 178–80). The television Bernstiel had seen being watched on October 3 was in a different apartment. (11/25/02 tr. at 144). Sweeney was told by a tenant that Grimm had told them to put the tar paper on the windows to prevent detection of their presence from outside. (11/22/02 tr. at 37).

70. Sweeney, O'Donnell and Bernstiel observed the extension cords, tar paper, and signs that people were living in the apartments. Sweeney knew that using extension cords as a permanent power source is both dangerous and a code violation, and that Grimm had previously been warned against using extension cords as a permanent power supply. (11/25/02 tr. at 36, 38; *see* Findings of Fact ¶ 34). He also knew that it was illegal for the building to be occupied because it was condemned. (11/25/02 tr. at 35).

71. Bernstiel knew that there was a hispanic family living in apartment two. (11/25/02 tr. at 144). When Bernstiel spoke to Grimm on that day, Grimm never told him he had been living in that apartment. (11/25/02 tr. at 146). Bernstiel was told on October 4 by several tenants that Grimm had accepted rent from them. (11/25/02 tr. at 149). This includes the statement of Ms. Diane Folger, who claimed she was living in apartment three and that she had been watching television the previous evening. (11/25/02 tr. at 153). Bernstiel allowed her to enter 837 Swede Street to retrieve her belongings. (11/25/02 tr. at 153). Bernstiel gave the various documents he had obtained from the tenants to Sweeney and also told him that Grimm had tried to collect rent from the tenants the previous day. (11/25/02 tr. at 149).

72. We find that there were, in fact, tenants illegally occupying 837 Swede Street, and that extension cords were illegally being used to power those tenants' apartments. We do not find Grimm's claims, that he did not know tenants were illegally occupying his building, (11/20/02 tr. at 33–34; 11/22/02 tr. at 31–32; 11/26/02 tr. at 93–97), or that extension cords were being used to provide permanent power for them, (11/20/02 tr. at 20; 11/26/02 tr. at 86, 88, 98), credible. O'Donnell wrote a citation to Grimm Brothers Realty for allowing tenants to occupy a condemned building. (11/26/02 tr. at 55–56; Def. Exh.D–42). Sweeney wrote Grimm Brothers Realty a citation for using extension cords as a source of permanent power. (11/25/02 tr. at 38–39). O'Donnell and Sweeney did so not out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits, for Grimm's suit to lift the condemnation or for Grimm's public comments regarding code enforcement. Instead, they did so because it was clear to them, as it is to us, that there were tenants illegally living in a condemned building and because Grimm was allowing these tenants to use extension cords as a permanent source of power. (11/25/02 tr. at 38–39; 11/26/02 tr. at 55–56).

### *837 Swede Street—The Two–Hour Fire–Rated Separation Requirement*

73. On April 26, 1999, 837 Swede Street was inspected by a Borough code enforcement officer. The inspection report required Grimm to fill in the holes in the basement ceiling with fire-rated material. (11/25/02 tr. at 50; Def.Exh.D–29, p. 2, 7). Grimm never made all of these repairs, but did patch some of the holes with new drywall (11/22/02 tr. at 178;

11/25/02 tr. at 53; 11/26/02 tr. at 114, 124). If he had attempted to obtain permits to complete the repairs, Sweeney would have told him that he was required to replace the entire ceiling with a two-hour fire-rated separation. (11/25/02 tr. at 51).

74. On March 7, 2000, when Sweeney inspected 837 Swede Street following the fire, he found that the basement ceiling had penetrations in it and that one section of the basement, the "electric room," had no ceiling at all. (11/22/02 tr. at 177, 181, 217–18; 11/25/02 tr. at 53, 82; Def.Exh.D–29, p. 66–67C).

75. Sweeney knew then that Grimm Brothers Realty had purchased the building in 1980 and that the zoning application Grimm filed stated that Grimm would convert the second floor rear area, previously a meeting room and banquet hall, into two apartments. (11/22/02 tr. at 185, 218–219; 11/25/02 tr. at 55; Pl. Exh. P–94). Sweeney believed that the ceiling, made of plaster lathe, had been required by earlier building codes because "people don't just go and put some sort of plaster lathe ceilings in all basements." (11/22/02 tr. at 176, 181). He believed the plaster lathe, if unbroken by penetrations, would provide up to 45 minutes of fire-rated protection. (11/22/02 tr. at 175–76; 11/25/02 tr. at 54).

76. Sweeney believed then, and continues to believe, that Grimm broke through parts of the ceiling when he installed the plumbing, electric and heating lines to the two new apartments he installed after his zoning application was approved. (11/22/02 tr. at 218–19; 11/25/02 tr. at 81). Sweeney believed that the penetrations in the ceiling had been made within the previous ten to fifteen years. (11/25/02 tr. at 8, 54). He also believed then, and continues to believe, that there was once a fire-rated separation between the electric room and the rest of the basement, such that the electric room did not require a ceiling, but that

Grimm removed that fire-rated door. (11/22/02 tr. at 177; 11/25/02 tr. at 82, 91).

77. Sweeney believed then, and continues to believe, that the 1981 BOCA Building Code would require a two-hour fire-rated separation between the basement and the first floor if the building were erected today. (11/22/02 tr. at 217–18, 221, 225–27). He also believed then, and continues to believe, that if an alteration is made to a structural part of a building, which includes a basement ceiling, the entire part (i.e. the entire basement ceiling) must be brought into compliance with the current BOCA Building Code through the application of the applicable Existing Structures Code. (11/22/02 tr. at 179, 217–221). Grimm believed then, and continues to believe that the 1981 Existing Structures Code (incorporated in the 1981 BOCA Building Code) had been adopted at the time Grimm made the penetrations in the basement ceiling. (11/22/02 tr. at 219, 221; 11/25/02 tr. at 8). Sweeney also believed then, and continues to believe, that either the 1978 Fire Prevention Code or the 1967 BOCA Building Code contained the identical requirement that any alteration of a structural part would require the entire structural part to be brought up to code. (11/22/02 tr. at 219; 11/25/02 tr. at 10). Sweeney's beliefs were bolstered by defense expert Rosen's findings, who issued them in July, 2001. Rosen found that there was a separation affording some fire protection in the basement ceiling. (11/22/02 tr. at 137). He found that the ceiling had been penetrated by piping and ducting when the first floor was converted. (11/22/02 tr. at 130–31, 144, 151). He agreed with Sweeney that the existing structures code requires that whenever an element of a building is altered, including a ceiling, the element must be brought up to the standards laid out in the modern Building Code. (11/22/02 tr. at 147). Be-

cause he could see that the ceiling had been altered, Rosen found that the ceiling had to be replaced with a two-hour fire-rated separation. (11/22/02 tr. at 146, 149).

78. Sweeney believed then and continues to believe that the 1981 Existing Structures Code affords him flexibility in approaching problems involved with bringing grandfathered buildings up to code as alterations are made. (11/22/02 tr. at 223–24; 11/25/02 tr. at 59). That is why Sweeney provided Grimm the three options of 1) emplacing a 2–hour fire-rated separation in the basement ceiling, 2) installing an approved sprinkler system or 3) abandoning the commercial/warehouse/shop use he was making of the basement so that a two-hour separation would no longer be required. (11/22/02 tr. at 224; 11/25/02 tr. at 57, 59, 75).

79. The Borough adopted the 1981 BOCA Basic Building Code ("1981 BBC") on December 1, 1982. (11/25/02 tr. at 5–6). The 1981 BBC covers existing structures, and requires that whenever an alteration or repair is made to an existing structure, the alteration must comply with the the standards applicable to a new building. BBC 100.2, 103.0. This is analogous to the 1987 Existing Structures Code ("1987 ESC"), adopted by the Borough on April 4, 1987 (Def.Exh.D–27), section 102.1, which requires that any repair or alteration to an existing structure must be done according to the modern applicable code. 1987 ESC 102.1; (11/21/02 tr. at 108–109; 11/22/02 tr. at 221) The building, if built today, would require at least a two-hour fire-rated separation between the ceiling and the first floor. (BBC Table 313.1.2; 11/21/02 tr. at 145–146 (Def.Exh.Scipione); 11/22/02 tr. at 124 (Def. Expert Rosen); 11/22/02 tr. at 179 (Sweeney); Def.Exh.D–26, p. 12).

80. We find that Grimm did, in fact, make the penetrations in the basement ceiling in 1983 or 1986, when he, respec-

tively, repaired the heating and electrical systems in the basement, and converted the second floor meeting room and banquet hall to apartments. (Def.Exh.D–65, D–66). Grimm's claim that he began working on converting the second floor space to apartments before he obtained zoning approval to do so, in December 1981, (Def.Exh.D–66), or immediately thereafter, (11/26/02 tr. at 81, 85), is not credible. Although he specifically remembers installing the shelving referred to in the December 29, 1983 permit to do "gen. repairs basement elec, heating, shelving," Grimm claims not to recall what heating or electrical work he did, (11/26/02 tr. at 84), but at the same time asserts that the heating and electrical work was unrelated to the apartment conversions, (11/26/02 tr. at 81); this undermines his credibility. His evasive answer as to whether the 1983 permit was the first permit he obtained after zoning approval, "this is the only one I have in my records," (11/26/02 tr. at 82) further damages his credibility. When confronted with the August 25, 1986 permit, to do "Gen. renovation (into offices)" at an estimated cost of $50,000, Grimm at first agreed that the permit was for conversion of the second floor Knights of Columbus space to apartments at 837 Swede Street, (11/26/02 tr. at 82), and then changed his mind, claiming the permit was issued for 839 Swede Street, despite its handwritten notation, and his own previous recollection, that it was actually for 837 Swede Street. (11/26/02 tr. at 83). However, Grimm admitted that 839 Swede Street does not have any offices. (11/26/02 tr. at 83). A moment later, under questioning by his own attorney, Grimm changed his mind yet again, and claimed that he had indeed acted on this permit and made renovations into offices at 839 Swede Street, despite the fact that he had just agreed there are no offices at 839 Swede Street. (11/26/02 tr. at 84). This exchange severe-

ly damaged Grimm's credibility on this issue.[18] We similarly do not credit Grimm's claim, made at the end of the trial, that he installed the electrical and plumbing conduits required for the new apartments only in the electrical room, which never had a ceiling. (11/26/02 tr. at 112–13).

81. Even if Grimm did not make the penetrations after 1981, when the 1981 BBC was adopted, we find that Sweeney believed and was reasonable in believing that he had done so after 1981. This is particularly true in light of the fact that Grimm had made alterations to the ceiling in 1999, when he attempted to comply with the April 26, 1999 inspection report by patching some of the holes in the ceiling with new drywall. (11/26/02 tr. at 114–15). Grimm also admits to having added one layer of drywall in the electric room in May, 2000. (11/26/02 tr. at 115–16).

82. We find that Sweeney based his requirement that Grimm either install a two-hour fire-rated separation or an approved sprinkler system, or permanently cease using the basement as a warehouse and shop, on his beliefs, which were reasonable, that Grimm had made penetrations in the ceiling and that the existing structures code required the ceiling to be brought up to modern standards. He did not base this requirement on a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits, for Grimm's suit to lift the condemnation or for Grimm's public comments regarding Borough code enforcement. (11/22/02 tr. at 179, 213, 234; 11/25/02 tr. at 48, 106).[19]

*837 Swede Street—April 19, 2000*
*Citation for Allowing Workers to*
*Occupy a Condemned Building*

83. Defendant Sweeney and the Borough building inspector, Lynne Bixler, inspected 837 Swede St. on April 19, 2000. (11/20/02 tr. at 114; 11/22/02 tr. at 162). Gary Grimm was already at 837 Swede when they arrived, and he made them wait while he finished a business-related phone conversation. (11/22/02 tr. at 162, 163).

84. Besides Mr. Grimm, there was a female secretary, wearing a dress, and a man entering data on a computer. (11/20/02 tr. at 115; 11/22/02 tr. at 162–63; 11/22/02 tr. at 236). In addition, Sweeney found two individuals who claimed to be in Mr. Grimm's employ but who were, we find, clearly living in apartment number four. (11/22/02 tr. at 236; 11/25/02 tr. at 94–95).

85. Mr. Sweeney believed the men were living in apartment four because he found clothing drying over the shower rod in the bathroom and shoes next to a made bed in the bedroom and because the window the men were allegedly repairing had already been repaired and showed no evidence of requiring further work. (11/22/02 tr. at 236; 11/25/02 tr. at 95).

86. Sweeney knew that Mr. Grimm was carrying out business at 837 Swede because every fax sent to him by Mr. Grimm had come from the fax machine at that address. (11/25/02 tr. at 101). Mr. Grimm has admitted that he is, in fact, using 837 Swede St. to conduct business. (11/21/02 tr. at 68; 11/22/00 tr. at 29–30). He has not received permission from the Borough to do so. (11/21/02 tr. at 68).

---

**18.** Grimm had previously claimed not to know whether he or a previous owner had made the penetrations in the ceiling. (11/22/02 tr. at 34).

**19.** In this regard, we also find that Sweeney has not enforced all of the possible code requirements that he could. (11/22/02 tr. at 233).

87. In Sweeney's experience as a code enforcement officer, he has never seen a landlord use a condemned space for records reconstruction; instead, landlords typically relocate records to a safe location and carry out reconstruction efforts there. (11/22/02 tr. at 175; 11/25/02 tr. at 100, 103). He believed that the secretary and data entry clerk were conducting business. (11/22/02 tr. at 235–36; 11/25/02 tr. at 97–98). We do not find credible Mr. Grimm's testimony that they were helping him to salvage business records. (11/20/02 tr. at 115).

88. Mr. Sweeney did not warn Mr. Grimm that he was planning to cite him for the non-traffic violation of allowing a condemned building to be occupied and did not warn Mr. Grimm that the office workers should not be on the premises. (11/20/02 tr. at 118; 11/25/02 tr. at 104–105). However, Mr. Grimm knew quite well that it was illegal for him to allow office workers or tenants to occupy 837 Swede Street because he had been notified over and over again that the building remained condemned and could not be occupied. (11/22/02 tr. at 164, 235; 11/25/02 tr. at 100; Def.Exh.D–1, D–2, D–3, D–4).

89. Mr. Sweeney did not ask the workers what they were doing because he was shocked that Mr. Grimm was so brazen as to conduct business on the very day of an inspection and because it was obvious to him, as it is to us, what those workers were about. (11/22/02 tr. at 164; 11/25/02 tr. at 99).

90. Mr. Sweeney issued a non-traffic citation for occupying a condemned building to Mr. Grimm on April 19, 2000. (Def.Exh.D–5). Mr. Sweeney knew that a court would eventually decide whether Mr. Grimm was guilty or not guilty of the offense, but he believed that Mr. Grimm was, in fact, guilty. (11/22/02 tr. at 170, 236).

91. The citation was later dismissed after a trial at which Mr. Sweeney testified. (11/20/02 tr. at 117).

92. Mr. Sweeney did not issue the citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits, for Grimm's suit to lift the condemnation or for Grimm's public comments regarding Borough code enforcement policies. (11/22/02 tr. at 174, 237). Instead, Sweeney issued the citation because he believed a violation had occurred. (11/22/02 tr. at 236).

### 837 Swede Street—April 30, 2000 Citation for Entering a Condemned Building

93. On April 30, 2000, defendant Sweeney was driving by 837 Swede Street when he saw Mr. Grimm enter the building. (11/22/02 tr. at 170).

94. Three factors led Sweeney to conclude that Mr. Grimm was not entering 837 Swede Street for the purpose of conducting work for which he had a permit—April 30, 2000 was a Sunday, Mr. Grimm was not wearing work clothing and Mr. Grimm had his dog with him. (11/22/02 tr. at 170–71, 236–37).

95. Sweeney issued a non-traffic citation for occupying a condemned building to Mr. Grimm. (11/22/02 tr. at 170; Def. Exh.D–7).

96. Sweeney believed that Mr. Grimm was entering 837 Swede Street for a purpose other than construction or rehabilitation of the premises pursuant to a permit obtained from the Borough. (11/22/02 tr. at 171, 237). It was on this basis that he issued the citation, even though he acknowledges that Mr. Grimm could have been entering the building for a legal purpose. (11/22/02 tr. at 172, 174, 237). Grimm eventually challenged the citation before a District Justice and it was dismissed. (11/20/02 tr. at 120; 11/22/02 tr. at 173).

97. Sweeney did not issue the citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits, for Grimm's suit to lift the condemnation or for Grimm's public comments regarding Borough code enforcement policies. (11/22/02 tr. at 237).

### 839 Swede Street—July 17, 2000 Citation for Failure to Maintain Property

98. On July 12, 2000, O'Donnell sent via United States mail an Immediate Action Required notice to Grimm Brothers Realty. The notice required Grimm Brothers Realty to cut some overgrown weeds in front of 839 Swede Street by July 14, 2000 or face possible citation by the Borough. (Pl. Exh. P–51; 11/22/02 tr. at 102). The weeds were blocking the view of pedestrians entering the street from the sidewalk and were therefore dangerously overgrown. (11/22/02 tr. at 106).

99. O'Donnell visited 839 Swede Street on July 17, 2000 and took photographs of overgrown weeds standing approximately five feet tall. (Def.Exh.D–31; 11/22/02 tr. at 108–09). At 4:00 p.m., after seeing the weeds in the same condition as when he wrote the Immediate Action Required notice, he issued a non-traffic citation to Mr. Grimm for failure to maintain 839 Swede Street free from plant growth in excess of ten inches, a violation of Borough ordinance 87–10, section 301.0.6. (Pl.Exh.P–53; 11/22/02 tr. at 106).

100. Grimm did not receive the immediate action notice until July 17, 2000, on which date he sent a fax to O'Donnell stating that the weeds had been cut that day. (Pl.Exh.P–52). Regardless of when O'Donnell received this fax, the weeds had not been cut at the time he visited the property and issued the citation on July 17, 2000. (Def.Exh.D–31; 11/22/02 tr. at 106, 110–11).

101. O'Donnell issued Immediate Action Required notices to forty landowners in addition to Mr. Grimm on July 12, 2000 requiring that weeds, plant growth or trees be cut by July 14, 2000. (Def.Exh.D–32; 11/22/02 tr. at 115–16). O'Donnell sent all of these notices by United States mail; it is not his practice to post such notices on the property itself (as a "door-knocker"). (Def.Exh.D–32; 11/22/02 tr. at 104). Thus, everyone who received such a notice was given only two days from the date of mailing in which to take corrective action. (11/22/02 tr. at 111). Approximately ten landowners in addition to Mr. Grimm were cited by O'Donnell for failing to comply with one of these notices within the timeframe given. (11/22/02 tr. at 116).

102. Mr. Grimm was found not guilty of the offense for which O'Donnell cited him because the judge found that he had not been given enough time between the mailing of the notice on July 12, 2000 and the deadline of July 14, 2000 to take corrective action. (11/22/02 tr. at 105).

103. O'Donnell did not issue the July 17, 2000 citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies. (11/22/02 tr. at 109–111). Instead, O'Donnell issued the citation because when he visited 839 Swede Street on July 17, 2000, it was apparent that Mr. Grimm had not cut the weeds at his property, in violation of the Immediate Action Required notice's requirement to do so. (11/22/02 tr. at 106).

### 857 Cherry Street—August 10, 2000 Condemnation and Citation for Failure to Obtain a Use and Occupancy Certificate

104. On August 6, 2000, David Wakefield, the tenant occupying the basement of

857 Cherry Street, contacted Borough Building Inspector Lynn Bixler to lodge a complaint against his landlord Gary Grimm. (11/26/02 tr. at 30; Def.Exh.D–16, D–16A). Bixler directed O'Donnell to make an inspection, and O'Donnell had good reason to make the inspection, given the serious issues raised by some of Mr. Wakefield's specific complaints, such as those regarding the presence of raw sewage in his rental space, a lack of sanitary facilities and an inoperable garage door. (11/26/02 tr. at 31).

105. O'Donnell met with Mr. Wakefield and conducted an inspection of the basement of 857 Cherry Street on August 10, 2000. (11/26/02 tr. at 31, 32). O'Donnell found that there were gas cans being stored in a wheelbarrow, no sanitary facilities despite the presence of a sewer hookup, open sewer lines and raw sewage leaking onto the floor. (11/26/02 tr. at 33; Def. Exh.D–18). These code violations are well-documented in the photographs taken by Mr. O'Donnell on the day of the inspection, which clearly show improperly stored flammables, inoperable sanitary facilities and raw sewage on the floor. (Def.Exh.D–18). In addition, O'Donnell found that there was no two-hour fire-rated separation between the basement unit and the residential units above and that the garage door, the secondary means of egress, was essentially inoperable. (11/26/02 tr. at 33). O'Donnell found a total of eleven violations of Borough ordinances, including no zoning approval for a second commercial space, no use and occupancy permit for Mr. Wakefield, a lack of sanitary facilities, evidence of a raw sewage back up, construction without permits, lack of working fire protection or smoke alarms, no approved fire-rated assembly separating commercial from residential spaces, a pad-locked entry/exit door, an inoperable secondary exit, illegal commercial operations taking place

and improper storage of flammable materials. (11/26/02 tr. at 37; Def.Exh.D–19).

106. Among the violations found by O'Donnell was the fact that Mr. Grimm had never obtained a use and occupancy certificate for the basement area's use as a commercial space by Mr. Wakefield, as required by Borough ordinances. (11/26/02 tr. at 33–34, 35, 36, 37). In fact, Mr. Grimm had no use and occupancy permit for the space, as he admitted during his testimony. (11/22/02 tr. at 25).

107. On August 10, 2000 O'Donnell issued a non-traffic citation to Mr. Grimm for failure to obtain a use and occupancy certificate for the basement. (11/22/02 tr. at 26; 11/26/02 tr. at 36; Def.Exh.D–33). O'Donnell was completely unaware of Mr. Grimm's public comments on Borough code enforcement policies with regard to use and occupancy certificates at the time he issued this citation. (11/26/02 tr. at 77). He was also unaware that the Borough council at some point reviewed the Borough's policies on use and occupancy certificates; indeed, the Borough's report was not issued until April 9, 2002, nearly two years after O'Donnell issued the citation. Mr. Grimm was found guilty of this violation after a trial before a District Justice on October 26, 2000. (11/22/02 tr. at 26; 11/26/02 tr. at 36; Def.Exh.D–34). O'Donnell did not issue this citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies.

108. On the basis of the eleven serious violations he found, Mr. O'Donnell also condemned the basement of 857 Cherry Street on August 10, 2000. (11/22/02 tr. at 61–62; 11/26/02 tr. at 35; Def.Exh.D–19). He issued a condemnation letter to Mr. Grimm informing him of this action, listing all eleven violations he had found and noti-

fying him that these conditions would have to be corrected in order for the condemnation to be lifted. (Def.Exh.D–19).

109. O'Donnell did not condemn the basement of 857 Cherry street out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies. (11/26/02 tr. at 38). O'Donnell issued the condemnation because he legitimately believed that it was warranted in the interests of public safety and the safety of the tenants, given the results of his inspection. (11/26/02 tr. at 38).

110. On November 2, 2000, Borough solicitor Paul Van Grossi wrote to Gary Grimm that the condemnation of 857 Cherry Street had been lifted. (11/25/02 tr. at 174; Def.Exh.D–22). It was not his decision to lift the condemnation, but rather that of Maureen Coggin, the attorney handling the matter. (11/25/02 tr. at 172; 11/26/02 tr. at 11, 14–15). Although Mr. Grimm, through counsel, threatened Mr. Sweeney by a letter dated October 20, 2000 that if the condemnations of his buildings were not lifted by October 23, 2000, he would initiate legal action in federal court, (Pl.Exh.P–98), Van Grossi did not lift the condemnation of 857 Cherry Street in response to this letter. (11/25/02 tr. at 175). He lifted the condemnation because he believed an arrangement had been made whereby the Borough would lift the condemnation and Mr. Grimm would carry out the repairs and alterations required under the condemnation order. (11/25/02 tr. at 175; 11/26/02 tr. at 12). Indeed, in his reply to Mr. Grimm's October 20, 2000 letter, Mr. Van Grossi explicitly stated that the condemnation of 857 Cherry Street was being handled by another attorney, (Def.Exh.D–29, p. 139), and, in any case, lifted only one of the two condemnations of

which it complained, and even then did so almost two weeks after the deadline posed by Mr. Grimm..(11/26/02 tr. at 15). O'Donnell had no role in the decision to lift the condemnation. (11/22/02 tr. at 39). Like Van Grossi, O'Donnell believed that the condemnation was lifted based on the understanding that Grimm would complete the necessary repairs. (11/22/02 tr. at 39).

### 857 Cherry Street—August 25, 2000 Citation for Failure to Obtain a Permission Slip to Enter a Condemned Building

111. Defendant O'Donnell was instructed by his supervisors to require that any person wishing to enter a condemned building first obtain a permission slip signed by a code enforcement officer. (11/22/02 tr. at 62). Though not required by any building code, this system allows police officers called to a condemned building readily to determine whether individuals occupying that building are there for a legitimate purpose. (11/22/02 tr. at 62–63). Permission slips are granted to individuals who wish to perform necessary work, for which they may require a permit in addition to the permission slip, or retrieve belongings. (11/22/02 tr. at 63).

112. Grimm knew that a permission slip was required to perform work at 857 Cherry Street. In the letter O'Donnell sent to Mr. Grimm on August 10, 2000 notifying him that the basement of 857 Cherry Street had been condemned, O'Donnell also warned Mr. Grimm in bold, italicized and underlined font that "no one may enter the property without first obtaining a signed permission slip from the Code Enforcement Department." (Def.Exh.D–19).

113. On August 22, 2000, Mr. Grimm sent a fax to O'Donnell informing him that he would be entering 857 Cherry Street for the purpose of "securing the space" and "addressing possible sanitary issues."

(11/21/02 tr. at 3; 11/22/02 tr. at 63; Pl. Exh. P–61). This was not a request for a permission slip, as, in Mr. Grimm's words, he was "basically putting [O'Donnell] on notice that we would be going over to make these corrections." (11/21/02 tr. at 3).

114. Mr. Grimm did not obtain a permission slip for the work he described in his August 22, 2000 fax to O'Donnell. On August 25, 2000, O'Donnell visited 857 Cherry Street, found two men performing work for Mr. Grimm and ordered them out of the building because they did not have a permission slip signed by a code enforcement official. (11/22/02 tr. at 64). Because the workers became hostile, O'Donnell, following standard procedure in such situations, called the police to assist him in removing them from the premises. (11/22/02 tr. at 64). He also issued a non-traffic citation to Grimm Brothers Realty for allowing its employees to enter a condemned space. (11/22/02 tr. at 64; Pl. Exh. P–62). The citation, numbered 2097877–5, was withdrawn by Borough Solicitor Paul Van Grossi by his letter of November 8, 2000. (Def.Exh.D–22). Because the citation was withdrawn, Mr. Grimm never had to go through the process of preparing to go to court to contest it. (11/21/02 tr. at 4).

115. O'Donnell did not issue the citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies. Instead, he did so because Borough policy required that anyone entering a condemned building have a permission slip and the workers had no permission slip.

116. On September 7, 2000, Mr. Grimm had an employee deliver a letter to O'Donnell requesting a permission slip to perform unspecified work at 857 Cherry Street. (11/21/02 tr. at 5; 11/22/02 tr. at 65; Pl. Exh. P–65). O'Donnell was not in the office when the letter was delivered, and the secretary who received the letter, Stacy Gandi, notified him by radio that an employee of Mr. Grimm's was requesting a permission slip. (11/22/02 tr. at 65–66). He told her that before a permission slip could be granted, the applicant would have to specify what kind of work was going to be done and indicate whether any of it required a permit. (11/22/02 tr. at 66). This is a standard requirement applied to all applicants for permission slips. (11/22/02 tr. at 66). O'Donnell knew that at least some of the repair work that would be required to lift the condemnation would require a permit and, indeed, that some of it would require prior approval by the building inspector. (11/22/02 tr. at 66–67). Although Mr. Grimm did not obtain a permission slip based on his September 7, 2000 letter, he would have been given one had he specified exactly what type of work he was going to perform. (11/22/02 tr. at 68).

117. After his employee returned from the code enforcement office on September 7, 2000 and Mr. Grimm learned that O'Donnell needed to know what work would be performed and whether any of it required permits, Mr. Grimm sent a fax to O'Donnell stating that he planned to do general repair in the basement of 857 Cherry Street, that none of the work he planned to do required a permit, and that he would assume he had the Borough's permission unless he heard back from O'Donnell. (11/21/02 tr. at 6; 11/22/02 tr. at 69; Pl. Exh. P–65). He never received a response from O'Donnell. (11/21/02 tr. at 6).

118. On September 8, 2000, Mr. Grimm faxed O'Donnell a list of specific repairs he planned to do that day at 857 Cherry Street. (11/21/02 tr. at 6; 11/22/02 tr. at 69; Pl. Exh. P–66). None of this work required a permit. (11/22/02 tr. at 69–71).

Mr. Grimm performed the repairs without incident.

### *857 Cherry Street—October 11, 2000 Citation for Refusal to Allow Access and Citation for Failure to Complete Required Repairs*

119. Operation Fresh Start was a collaboration between the Borough of Norristown and the District Attorney's Office of Montgomery County aimed at cleaning urban blight in Norristown. (11/26/02 tr. at 24). On July 11, 2000, Operation Fresh Start distributed flyers to the residents of the 600, 700 and 800 blocks of Cherry Street informing them that there would be a dumpster available between July 27 and August 3 to aid in an Operation Fresh Start program. (11/26/02 tr. at 23; Def. Exh.D–15). This program was carried out in other areas of Norristown as well and consisted primarily of building inspections for code compliance and quality of life issues. (11/26/02 tr. at 24). All rental properties in targeted neighborhoods were inspected. (11/26/02 tr. at 25).

120. The Grimm Brothers Realty property at 857 Cherry Street was in the neighborhood targeted by Operation Fresh Start between July 27 and August 3, 2000. (11/26/02 tr. at 25). On July 13, 2000, Grimm Brothers Realty was notified that the 857 Cherry Street property would be inspected on July 24, 2000 as part of Operation Fresh Start. (11/26/02 tr. at 25; Def. Exh.D–45). That appointment was rescheduled at the request of a resident of 857 Cherry for the following day. (11/26/02 tr. at 26; Def.Exh.D–45). After a failed attempt to inspect the building on July 25, 2000, another inspection was scheduled for August 14, 2000. (11/26/02 tr. at 26; Def. Exh.D–45, D–46). Grimm Brothers Realty was notified of the rescheduled inspection by letter dated July 25, 2000. (Def.Exh.D–46).

121. O'Donnell visited 857 Cherry Street on August 14, 2000 and was allowed into the building by one of Mr. Grimm's employees. (11/26/02 tr. at 26, 45). He completed an inspection of the three residential apartments on the second floor of the building. (11/26/02 tr. at 26, 27). O'Donnell completed a standard Bureau of Code Enforcement Inspection Report. (11/26/02 tr. at 26; Def.Exh.D–47). O'Donnell found numerous code violations in each apartment, listed separately, and included, on the last page of the report, a list of five additional conditions that required correction by Grimm Brothers Realty. (11/26/02 tr. at 29; Def.Exh.D–47). The problems O'Donnell found included trash piled in the hallways, inoperative fire extinguishers, inoperative or inaccessible smoke detectors, uninspected fire extinguishers, and unscreened windows. (Def.Exh.D–47).

122. On the last page of the inspection report, O'Donnell scheduled a follow-up inspection for September 14, 2000 to ensure that the conditions he found had been corrected within 30 days. (11/26/02 tr. at 29; Def.Exh.D–47). O'Donnell mailed the inspection report to Mr. Grimm by First Class mail, as is his custom for all such inspection reports. (11/22/02 tr. at 73, 78).

123. Mr. Grimm did not appear for the follow-up inspection on September 14, 2000. (11/22/02 tr. at 74; Def.Exh.D–48). O'Donnell sent Mr. Grimm a letter notifying him that because he had failed to show, O'Donnell had scheduled an inspection for September 26, 2000. (Def.Exh.D–48).

124. In response to O'Donnell's September 14, 2000 letter, Mr. Grimm faxed O'Donnell on September 17, 2000 indicating that he was unaware of the previous inspection notice and asking for another copy of the inspection notice "so I can have a complete file." (11/21/02 tr. at 9; 11/22/02 tr. at 76–77; Def.Exh.D–49). Mr. Grimm

did not say that he had never received a copy of the August 14, 2000 inspection report, and O'Donnell believed that the only thing Mr. Grimm was requesting was a copy of the notice scheduling an inspection for September 14, 2000. (11/22/02 tr. at 79–80). O'Donnell did not apprehend that Mr. Grimm had misunderstood the purpose of the September 14, 2000 inspection, believing that it was related to the condemned basement rather than to the apartments. (11/22/02 tr. at 80–81). Mr. Grimm sent a second fax on September 25, 2000, the day before the second rescheduled inspection, again requesting that O'Donnell provide him with another copy of the inspection notice "at your convenience, so I can complete my file." (Def.Exh.D–50).

125. On September 26, 2000, O'Donnell went to 857 Cherry Street to conduct the rescheduled inspection. (11/22/02 tr. at 78). Although O'Donnell was there to inspect the apartments as a follow up to his August 14, 2000 inspection, Mr. Grimm had sent an employee who spoke no english to let O'Donnell into the basement; the employee would not let O'Donnell into the apartments. (11/22/02 tr. at 74, 78; 11/26/02 tr. at 59–61, 79). O'Donnell sent Mr. Grimm a letter the same day, September 26, 2000, informing him that because he had failed to show at both the September 14 and September 26 inspections, he had scheduled a final inspection for October 10, 2000. (11/22/02 tr. at 79; Def. Exh.D–51). This letter explicitly states that this is to be a "final inspection *of the apartments*" and warns that if Mr. Grimm fails to show, he will be "cited for noncompliance." (Def.Exh.D–51, emphasis supplied).

126. Mr. Grimm replied to O'Donnell's September 26, 2000 letter by letter on October 5, 2000. (Def.Exh.D–52). In this letter, Mr. Grimm states that he is "denying any further access by Borough employees to any of my properties." (11/22/02 tr. at 83; Def.Exh.D–52).

127. On October 10, 2000, O'Donnell went to 857 Cherry Street to conduct the inspection he had scheduled for that date by way of his September 26, 2000 letter. (11/22/02 tr. at 83). No one from Grimm Brothers Realty was there to meet him, (11/22/02 tr. at 83), and he had no contact with tenants on that day. (11/26/02 tr. at 43–44). O'Donnell issued a non-traffic citation to Grimm Brothers Realty for "refus[ing] free access to the building to conduct proper inspections by Borough Code Officials" under Borough Ordinance 87–10.105.3.2.1. (11/26/02 tr. at 46; Def. Exh.53). According to Grimm, although Grimm Brothers Realty was convicted in absentia of the violation, the conviction was vacated by a Court of Common Pleas judge on the grounds that it had to be prosecuted by the Borough solicitor rather than by a county district attorney, and the Borough solicitor has not acted to prosecute the citation since. (11/21/02 tr. at 11–12).

128. The Borough adopted the 1987 Existing Structures Code on April 7, 1987 by the adoption of Borough Ordinance 87–10. (Def.Exh.D–27). Each section of Borough Ordinance 87–10 corresponds to the identically numbered section of the Existing Structures Code, thus Borough Ordinance 87–10 section 105.3.2 is the same as 1987 Existing Structures Code section 105.3.2, "Right of Entry," and provides that a code enforcement official may seek an administrative search warrant whenever an individual refuses access for a duly authorized inspection. (11/26/02 tr. at 47; 1987 Existing Structures Code 105.3.2). Borough Ordinance 87–10 section 105.3.2.1 is an addition to the 1987 Existing Structures Code section 105.3.2, added when the Borough adopted Ordinance 87–10.

(11/26/02 tr. at 47). Borough Ordinance 87–10 section 105.3.2.1 provides that failure to comply with the Right of Entry section of the Existing Structures Code is a violation of the ordinance subject to a penalty provided by Existing Structures Code section 110.2. (11/26/02 tr. at 46; Def. Exh.D–27). It is pursuant to this authority that O'Donnell cited Mr. Grimm. (11/22/02 tr. at 87, 114; 11/26/02 tr. at 40, 46, 48).

129. O'Donnell has never had legal training and is not a lawyer. (11/22/02 tr. at 114). He has cited a number of other landlords under section 105.3.2.1 of Borough Ordinance 87–10. (11/22/02 tr. at 87, 114). At least some of these have been found guilty of this violation by a District Justice. (11/22/02 tr. at 114; 11/26/02 tr. at 40). Some of these landlords have been found guilty of a violation under section 105.3.2.1 by a Judge of the Court of Common Pleas of Montgomery County. (11/22/02 tr. at 115; 11/26/02 tr. at 41). O'Donnell was trained to issue citations when landlords refuse access for a duly authorized inspection. (11/22/02 tr. at 87).

130. O'Donnell did not issue the citation out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies. (11/26/02 tr. at 41). He issued it because Mr. Grimm had failed to show for any of the required inspections. (11/26/02 tr. at 41).

131. After Mr. Grimm failed to appear for the October 10, 2000 inspection, O'Donnell obtained a search warrant from a Judge of the Court of Common Pleas of Montgomery County. (11/22/02 tr. at 88; Def.Exh.D–54). This is the standard procedure followed whenever a landlord refuses access to a building. (11/22/02 tr. at 88). The search warrant lists all the conditions O'Donnell had listed as requiring correction in his August 14, 2000 inspection report. (11/22/02 tr. at 90–94; Def. Exh.D–54).

132. O'Donnell went to 857 Cherry Street on August 11, 2000 with Sergeant Tims and two other police officers. They did not contact Mr. Grimm prior to going to the property because O'Donnell assumed he would be uncooperative. (11/22/02 tr. at 99). One of these officers went to the side fire escape, entered through the broken fire escape door, went to the front door and let O'Donnell and the other officers into the building. (11/22/02 tr. at 95). No exterior doors were broken in order to gain entry to the premises. (11/22/02 tr. at 98). O'Donnell then conducted his inspection. (11/22/02 tr. at 97). The photographs taken by Mr. Grimm between October 11 and October 16, 2000 do not depict any broken exterior doors except the fire escape door, which we find was already broken when O'Donnell arrived. (Pl.Exh.P–86).[20]

133. Only two of the three apartments were occupied. One of these apartments was occupied by a woman who allowed entry to her apartment. (11/22/02 tr. at 97; 11/26/02 tr. at 42). Two hispanic men in a second unit refused entry, which required the police to force the door open, and were found hiding in a closet. (11/22/02 tr. at 97). O'Donnell did not force entry into any apartment, leaving that task to the police officers who accompanied him. (11/22/02 tr. at 97, 98). The two hispanic men were, in fact, employees of Mr. Grimm's engaged in painting the unit in which they were hiding. (11/22/02 tr. at 100). Sergeant Tims advised them that they had to secure the

20. In this connection, we do not find credible Grimm's claim that the officers broke open the exterior doors to the building. (11/21/02 tr. at 13–14).

property as representatives of Mr. Grimm. (11/22/02 tr. at 100).

134. O'Donnell found that the conditions he had listed in his August 14, 2000 inspection report had not been corrected. (11/26/02 tr. at 49; Def.Exh.D–56). He therefore issued a non-traffic citation to Grimm Brothers Realty for failing to correct the building, safety, fire and electrical violations listed in his August 14, 2000 inspection report within the time specified therein. (11/26/02 tr. at 49; Def.Exh.D–55).

135. This citation was issued because the repairs O'Donnell had found needed to be made during his August 14, 2000 inspection had not been made. (11/26/02 tr. at 49). It was not issued out of a desire to retaliate against Grimm or Grimm Brothers Realty for their involvement in the NAIL I lawsuits or for Grimm's public comments regarding Borough code enforcement policies. (11/22/02 tr. at 101–02; 11/26/02 tr. at 49).

### Grimm's and Grimm Brothers Realty's Previous Citations

136. Buildings owned or managed by Grimm and Grimm Brothers Realty were found to be in violation of Borough codes, cited and/or condemned prior to the NAIL I law suits being settled. (11/21/02 tr. at 56–57; Def.Exh.D–57).[21] These actions include a February 14, 1995 notice that 857 Cherry Street had failed HUD housing standards (11/21/02 tr. at 56–67; Def. Exh.D–57, unnumbered p. 23–25); an April 4, 1995 inspection report noticing numerous health, electrical, fire and safety violations at 857 Cherry Street (11/21/02 tr. at 57–58; Def.Exh.D–57, unnumbered p. 26–28); and a September 22, 1997 notice

that apartment three of 857 Cherry Street was "severely roach infested" and "unfit for human habitation" (11/21/02 tr. at 58; Def.Exh.D–57, unnumbered p. 29). Over the years, the number of violations at the properties owned by Grimm's family and its enterprises was so great that in 1983, then—Borough Manager John Plonski began personally reviewing permit applications from "any of the Grimm enterprises." (11/21/02 tr. at 58–59; Def.Exh.D–57, unnumbered p. 30).[22] None of these actions were taken against Grimm or Grimm Brothers Realty properties by either Sweeney or O'Donnell. (11/21/02 tr. at 56–59). They all predate the NAIL I litigation and Grimm's public comments regarding code enforcement policies. (11/21/02 tr. at 60).

137. O'Donnell has not cited Grimm or Grimm Brothers Realty for any violation at any property since October, 2001. (11/26/02 tr. at 56). Sweeney has not cited Grimm or Grimm Brothers Realty for violations at any property other than 837 Swede Street since March 7, 2000. (11/26/02 tr. at 39). Neither Sweeney nor O'Donnell have cited Grimm or Grimm Brothers Realty for any violations occurring at 202 Jacoby Street, 636 Cherry Street or 901 Swede Street, the other properties owned by Grimm Brothers Realty, at any time relevant to this action. (*See* Findings of Fact ¶ 2).

### Damages

138. We decline to make findings of fact regarding damages except to the extent that we find that Grimm's claims for damages, (11/21/02 tr. at 36–45), are not

---

**21.** We note that at least some of these citations and condemnation notices were issued before Grimm or Grimm Brothers Realty owned the property in question. (11/21/02 tr. at 56; *see*, e.g., Def.Exh.D–57, unnumbered p. 12, 14–15).

**22.** As Grimm pointed out, this notice was issued to Grimm's father's company, Grimm Properties. (11/21/02 tr. at 58–59). Nevertheless, the notice refers to "any of the Grimm enterprises," which we take to include those owned by Grimm himself.

only unsupported by any evidence other than his own testimony[23] but also not at all credible. Grimm offered no documentary proof of any of his alleged damages, did not itemize them sufficiently and frequently could provide only guesses as to their magnitude.[24] As will be apparent, full findings of fact regarding damages are not required.

139. Grimm Brothers Realty has not filed a federal tax return since 1996. (11/21/02 tr. at 63; 11/22/02 tr. at 39). Grimm never supplied his personal tax returns to defendants, despite three requests at his deposition to do so. (11/21/02 tr. at 63–64). Grimm Brothers Realty has not generated a profit for ten years. (11/22/02 tr. at 38, 44). Tax liens have been levied against all six of its properties and they were up for sale by the Sheriff in 2001. (11/22/02 tr. at 38). Grimm has refused to pay Borough licensing fees for the past two years despite the fact that the NAIL I lawsuits settled that issue. (11/21/02 tr. at 61).

## III. SUMMARY OF FINDINGS OF FACT

We have found that none of the actions taken by Sweeney or O'Donnell with regard to Grimm or Grimm Brothers Realty were motivated by a desire to retaliate against them for their involvement in the NAIL I law suits against the Borough or for Grimm's public comments regarding Borough code enforcement policies. (Findings of Fact ¶¶ 26, 33, 35, 39, 40, 54, 58, 61, 65, 72, 82, 92, 97, 103, 107, 109, 115, 130, 135). We have also found that none of Sweeney's actions were taken out of a desire to retaliate against Grimm for his suit to lift the condemnation of 837 Swede Street, which named Sweeney as a defendant. (Findings of Fact ¶¶ 35, 40, 65, 72, 82, 92, 97).

We have found that O'Donnell was not even aware that Grimm or Grimm Brothers Realty were involved in the NAIL I lawsuits. (Findings of Fact ¶ 13). Neither Sweeney nor O'Donnell played more than an extremely minor role in responding to the lawsuits, and neither was adversely affected by their eventual settlement. (Findings of Fact ¶ 14). We have found that, while Grimm has represented that he and his own organization, NAIL II, were the leaders of the lawsuits against the Borough, in fact it was an entirely different organization with an entirely different leader who initiated and prosecuted those suits. (Findings of Fact ¶¶ 9, 11) The founder of NAIL I, the organization that actually commenced and pursued the litigation, has never been retaliated against for his leading role in the lawsuits. (Findings of Fact ¶ 15).

We have found the Grimm began publicly criticizing Borough code enforcement policies beginning only in November of 2001, one month after the last citation complained of in this action was written and ten months after this action was filed. (Findings of Fact ¶ 20). O'Donnell was unaware of Grimm's criticism, did not

---

**23.** Grimm did offer an estimate, prepared by Balin Construction, Inc., for the cost of repairing damage done after pipes burst at 837 Swede Street. (11/21/02 tr. at 37–38; Pl. Exh.P–82). However, as Grimm himself admits, this document is only an estimate and Grimm does not have a figure for how much the work actually cost him to do. (11/21/02 tr. at 38).

**24.** For example, Grimm could only say that he "believed" he had borrowed "approximately $3,000" to defend himself in the prosecutions of his various citations. (11/21/02 tr. at 39). No legal bills were entered into evidence, no testimony was offered as to how Grimm arrived at this figure, and no breakdown of how much money was spent in defending each citation was provided.

know Grimm was a member of NI, the vehicle by which Grimm commented on Borough policies, and did not even know NI existed. (Findings of Fact ¶ 18, 107). Sweeney, while he knew of NI's existence, actually appeared at an NI public forum to answer questions regarding code enforcement policies. (Findings of Fact ¶ 19).

We have found that Grimm and Grimm Brothers Realty were issued citations, notices of violation and condemnation orders long before any of the NAIL I lawsuits. (Findings of Fact ¶ 136). We have also found that only three of Grimm Brothers Realty's six Norristown properties have received citations or condemnation orders since the settlement of the NAIL I lawsuits. (Findings of Fact ¶¶ 2, 137). One of the three that has been the subject of code enforcement action, 839 Swede Street, has received only one citation in this time. Throughout the time 837 Swede Street has been condemned, the Borough Fire Department, of which O'Donnell is a board member, has hosted NAIL II's regular meetings. (Findings of Fact ¶ 18).

Throughout the trial, Grimm's testimony was almost completely incredible. (Findings of Fact ¶¶ 9,11, 19, 20, 21, 28, 51, 52, 56, 58, 60, 62, 64, 72, 80, 84, 87, 132, 138). Grimm's testimony was not believable for several reasons. First, his demeanor and manner while under examination were not consistent with truthful testimony. When asked about even relatively minor issues, even by his own attorney, Grimm's answers were frequently vague or evasive. (See, e.g., 11/20/02 tr. at 97:9–14). On contentious issues, Grimm's responses were often apparently intentionally evasive or so convoluted as to be devoid of clear meaning. (See, e.g., Findings of Fact ¶¶ 56, 80). Second, the content of Grimm's

testimony was frequently contradicted by credible testimony from other witnesses or by documentary evidence. (See, e.g., Findings of Fact ¶¶ 4, 11, 21). Third, Grimm's testimony was frequently internally inconsistent, even within the same block of questioning. (See, e.g., Findings of Fact ¶ 11, 20, 44, 45, 51, 53, 80). Finally, over and over again throughout the trial, Grimm's initial answers, always casting his own actions and knowledge in the most favorable light, would change in response to evidence and testimony of other witnesses, often dramatically. (See, e.g., Findings of Fact ¶¶ 9, 34, 64, 80).

Perhaps the best example of this behavior can be seen with reference to the October 4, 2001 violations of allowing tenants to occupy a condemned building and of using extension cords as a permanent power supply. (See Findings of Fact ¶¶ 66–72). Under questioning by his own attorney, Grimm initially claimed that the extension cords were being used to do work on the upper floor of the building and not as a source of permanent power. (11/21/02 tr. at 20). Later, after being confronted with the pictures of the extension cords clearly going into the apartments on that floor, and clearly powering household appliances, Grimm claimed, again, that he had no knowledge they were there but hedged his statements by implying that there might not have been work being performed in October of 2001. (11/26/02 tr. at 86–87). In addition, his answer to whether he had put the extension cords there, "not me, personally, absolutely not," was suspiciously narrow.[25] (11/26/02 tr. at 86). It is inconceivable that Grimm and his workers could have been performing work on the second floor of 837 Swede Street, using those extension cords, and not have seen them going to

---

**25.** Grimm also testified that he had no knowledge of the extension cords being run to the

apartments. (11/26/02 tr. at 86, 98).

apartments and powering appliances or not have known tenants were living there.[26] (11/26/02 tr. at 98).

Grimm's responses with regard to whether he knew tenants were living in 837 Swede Street in October, 2001 are even more contradictory.[27] At first, Grimm claimed he was unaware of any tenants living in the building. (11/21/02 tr. at 34). He conceded that he had allowed tenants to move their belongings in (which, we note, blatantly violated the standing condemnation order) but had not allowed them to take occupancy. (11/21/02 tr. at 33). After Detective Bernstiel testified that the tenants had told him Grimm had made them pay rent to live at 837 Swede Street and shown him the leases to prove it, (Findings of Fact ¶ 67, 71), Grimm, under cross-examination, admitted that he had taken money from these individuals but claimed that it was as rent or deposit for apartments in other Grimm Brothers Realty buildings. (11/26/02 tr. at 91–93). He claimed that he had provided, through an interpreter and in writing, notice to the tenants telling them they could not move into 837 Swede Street until he received permission from the Borough. (11/26/02 tr. at 93–94). Given Castro's devastating testimony regarding her employment with Grimm the previous summer and Grimm's inadequate response thereto, (Findings of Fact ¶¶ 55–56), we are incredulous of Grimm's claim that he "hired an interpreter" to tell the tenants that they could not occupy 837 Swede Street in 2001. (11/26/02 tr. at 94). When pressed on why he felt it necessary to provide written notice, (Pl. Exh.P–80), in addition to and after the oral warning, Grimm asserted that it was in response to his tenants' insistent demands to know when they would be allowed to move into 837 Swede Street. (11/26/02 tr. at 93–94). Bernstiel testified that the Spanish-language version of the notice produced at trial was never to his knowledge given to the tenants at 837 Swede. (11/25/02 tr. at 140–41).

Grimm also acknowledged that he had given the tenants keys to their apartments to move their possessions into the building, (11/26/02 tr. at 94), but continued to insist that he did not know any of them had actually begun occupancy. (11/26/02 tr. at 95). This is totally belied by Grimm's additional claim, offered in rebuttal, that he did not turn on the main electrical breakers out of fear that the tenants might move in early if the electrical power were turned on to their units. (11/26/02 tr. at 97). If Grimm was truly concerned that tenants would try to move in if he turned on the main breakers to the building, we are left to wonder why he thought not giving them keys to the apartments would not have been a surer method.

Apparently in an effort to explain away Bernstiel's testimony of having seen a television on in one of the apartments, and of having found tar paper in another apartment, (See Findings of Fact ¶¶ 66, 69), Grimm claimed that at some point he was living in the apartment with the tar-papered windows because of domestic difficulties. (11/26/02 tr. at 100). He never told Bernstiel that he was living there on the day that Bernstiel found a hispanic family living in that unit (who told him that

---

26. Grimm also acknowledged, at first, that one of the apartments which was found to be occupied is directly over his office at 837 Swede Street. (11/22/02 tr. at 32). Later, after hearing Bernstiel's damaging testimony, Grimm testified that he would not have been able to see or hear tenants entering the building. (11/26/02 tr. at 97–98).

27. Grimm's state of mind is irrelevant to the legal issues involved in this case. We discuss it here only to illustrate Grimm's complete lack of credibility.

Grimm had told them to paper over the windows), (Findings of Fact ¶ 71), and, conveniently, Grimm later testified that he was not living there in October, 2001. (11/26/02 tr. at 88).

It is our finding that Grimm's claims are meritless in every way. Neither O'Donnell nor Sweeney were inconvenienced, let alone harmed, but the NAIL I lawsuits. O'Donnell did not even know Grimm or his company were involved in them. Grimm's public criticism of Borough code enforcement policies, which forms half of the basis of the plaintiffs' case, did not even begin until long after this action was filed. Grimm's testimony revealed his utter lack of truthfulness with regard to the events surrounding the numerous citations and condemnations he and his company have been issued. It is clear to us that neither O'Donnell nor Sweeney ever acted against Grimm or Grimm Brothers Realty out of any improper or retaliatory motive.

## IV. DISCUSSION

After our Opinion and Order of March 11, 2002, deciding the parties' cross-motions for summary judgment, *Grimm*, 226 F.Supp.2d 606, four legal issues remained for trial against O'Donnell and Sweeney in their individual capacities. Three of these were predicated on 42 U.S.C. § 1983: 1) the claim that the defendants cited the plaintiffs and condemned plaintiff Grimm Brothers Realty's properties in retaliation for the plaintiffs' exercise of rights protected under the First Amendment; 2) the claim that the defendants cited the plaintiffs and condemned Grimm Brothers Realty's properties in violation of the plaintiffs' Substantive Due Process rights; and 3) the claim that defendant O'Donnell cited Grimm Brothers Realty on October 11, 2000 for refusing access to its 857 Cherry Street property in violation of Grimm Brothers Realty's rights under the Fourth Amendment. *Grimm*, 226 F.Supp.2d at 659. The fourth legal issue remaining for trial was plaintiff Grimm Brothers Realty's claim that the condemnations of 857 Cherry Street and 837 Swede Street violated Article I, Section 8 of the Pennsylvania Constitution. *Id.* In addition, we left for trial the defendants' affirmative defense of qualified immunity against all claims. *Id.* We address each of the plaintiffs' four claims below and discuss the defense of qualified immunity only where necessary.

## A. Scope of this Decision as Limited by the *Rooker–Feldman* Doctrine

As we found in our summary judgment Opinion and Order, the *Rooker–Feldman* doctrine [28] does not bar us from having

---

**28.** The *Rooker–Feldman* doctrine holds that lower federal courts lack subject matter jurisdiction to review final judgments of the highest court of any state. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1983); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In this Circuit, the *Rooker–Feldman* doctrine also bars district courts from reviewing final decisions of lower state courts. *E.B. v. Verniero*, 119 F.3d 1077, 1090 (3d Cir.1997). An order denying a preliminary injunction may be considered a final decision. *Port Auth. Police Benevolent Assoc. v. Port Auth. of New York and New Jersey Police Dept.*, 973 F.2d 169 (3d Cir.1992). Thus, the *Rooker–Feldman* doctrine may act to bar a district court from reviewing the denial of a temporary restraining order by a lower state court. In addition, the doctrine prohibits district courts from entertaining what amount to indirect appeals of state court orders based on issues "inextricably intertwined" with claims already adjudicated before the state court. *Feldman*, 460 U.S. at 482, n. 16, 103 S.Ct. 1303.

We held that only plaintiff Grimm Brothers Realty's claims regarding the condemnation of 837 Swede Street could potentially be barred by *Rooker–Feldman*, but found that the constitutional issues involved there had never been adjudicated by, and were not inextricably linked with issues that had been adjudicat-

subject matter jurisdiction to hear the plaintiffs' cause of action. *Grimm*, 226 F.Supp.2d at 625–26. The Court of Common Pleas of Montgomery County is still considering plaintiff Grimm Brothers Realty's challenge to the continued condemnation of 837 Swede Street, but has denied two motions for a preliminary injunction prohibiting the Borough from enforcing the condemnation order. (Def.Exh.D–68). The relief sought by plaintiff Grimm Brothers Realty in the state court proceedings, the lifting of the condemnation order, is entirely different from the relief sought here, which consists only of damages. *See* Complaint, ¶¶ 134, 139, 144. The state court action is based on a challenge to the applicability and interpretation of the Borough's building and existing structures codes, whereas this action is based on a challenge to Sweeney's motivations in continuing the condemnation.[29]

Our review of the defendants' actions is strictly limited to answering whether they violated the plaintiffs' constitutional rights. We express no opinion as to the validity of the continued condemnation of 837 Swede Street, in terms of whether it is a proper application of the Borough's building and existing structures codes, except to the extent that we rule on the constitutionality of Sweeney's motivations in continuing the condemnation. It is entirely possible that Sweeney's motivations were not improper and yet that the state court will ultimately lift the condemnation based on a finding that the codes simply do not require that it be continued.

## B. Section 1983 Claims

42 U.S.C. § 1983 imposes civil liability upon any person who, acting under color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. Section 1983 does not create any new substantive rights, but instead provides a remedy for the violation of a federal constitutional or statutory right. *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir.2000). To state a claim under Section 1983, a plaintiff must show that the defendant, through conduct sanctioned under color of state law, deprived her of a federal constitutional or statutory right. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1986); *Gruenke*, 225 F.3d at 298.

It is clear in this case that the condemnations and citations that form the basis of the plaintiffs' Section 1983 claims were issued under color of state law. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (actions by an official in her official capacity are under color of law even if they are not in furtherance of state policy and even if they violate state law). The next step in evaluating any Section 1983 claim is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). This is where our discussion of each of the three bases for plaintiffs' Section 1983 claims begins.

### 1. *First Amendment Retaliation Claims*

The plaintiffs allege that Sweeney and O'Donnell issued the citations and condemnation orders discussed in our

---

ed by, the state court considering Grimm's suit to lift the condemnation of 837 Swede. *Grimm*, 226 F.Supp.2d at 624, 625–26.

**29.** This action also encompasses challenges to both Sweeney's and O'Donnell's other actions, which are not challenged in the state court action.

Findings of Fact, *supra*, in retaliation for their exercise of their First Amendment rights to a) participate in lawsuits against the Borough of Norristown and b) criticize Borough of Norristown building code enforcement policies. To prevail on a First Amendment retaliation claim, a plaintiff must prove that: (1) she engaged in protected activity; (2) the government responded with retaliation and (3) the protected activity was the cause of the government's retaliation. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997). As we held in our summary judgment opinion, both participation in the NAIL I lawsuits and Grimm's public comments regarding code enforcement policies are protected activities under the First Amendment. *Grimm*, 226 F.Supp.2d at 638–39.

With regard to the second and third prongs, the Supreme Court has established a two-step burden-shifting approach. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.2001); *see Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216, 224–25 (3d Cir.1980). First, the plaintiff has the burden of proving that the protected conduct was a "substantial" or "motivating" factor in the defendant's decision. *Mt. Healthy City School Dist. Bd. of Edu. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the plaintiff carries her burden to do so, the burden then shifts to the defendant to demonstrate, by a preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct." *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir.2001) (citing *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568).

■ Here, with regard to every single citation and both condemnations, it is clear that the plaintiffs have not carried their burden. Initially, we note that the plaintiffs have offered no direct evidence of a retaliatory motive on the part of the defendants. Instead, we are asked to infer from the fact that the plaintiffs engaged in protected activity and were subsequently subjected to multiple citations and condemnations the legal result that they were retaliated against. There is no basis for drawing such an inference, however. In addition, even if we were to draw such an inference, the defendants have put forward sufficient evidence of non-retaliatory motive to more than overcome it, and the plaintiffs have utterly failed to overcome this evidence.

With regard to plaintiff Grimm's claim that he was retaliated against for his association with NI and for his public comments critical of code enforcement policies, we have made several findings of fact that make clear there is no evidence to support an initial finding that these activities formed a "substantial" or "motivating" factor in any of the defendants' decisions. First, defendant O'Donnell did not even know that NI existed, let alone that Grimm was a member, (Findings of Fact ¶ 18), and had no knowledge of Grimm's comments specifically regarding Borough policies on use and occupancy certificates. (Findings of Fact ¶ 107). Second, Grimm did not even begin criticizing Borough code enforcement policies until the end of November, 2001. (Findings of Fact ¶ 20), more than one month after the last citation complained of was written and more than ten months *after filing this action*.[30] To the extent that

---

**30.** It is true that the condemnation of 837 Swede Street continues to this day. However, given that the condemnation had already been in place some eighteen months before

Grimm began his public criticism of code enforcement, it is inconceivable that those public comments were a substantial or moti-

Grimm participated in efforts to obtain building codes from the Borough before this time, his role was so minor, and the effort so innocuous, that it could not have formed the basis of a retaliatory motive on the part of either defendant. (Findings of Fact ¶ 21). The plaintiffs failed to carry their burden to establish, as a preliminary matter, that a desire to retaliate for Grimm's public comments regarding code enforcement policies was a substantial or motivating factor in any of the defendants' actions.

The plaintiffs also utterly failed to carry their burden with regard to their claim that their participation in the NAIL I lawsuits, and the settlement of those lawsuits favorably to the plaintiffs, prompted retaliatory action by the defendants. First, defendant O'Donnell did not even know that either Grimm or Grimm Brothers Realty were plaintiffs in the NAIL I lawsuits. (Findings of Fact ¶ 13). It is impossible that he could have been motivated to act against the plaintiffs when he was not even aware of their participation in protected activity. Second, neither defendant was appreciably inconvenienced by the process of defending those lawsuits, given that neither had any role in them as other than non-party fact witnesses at depositions. (Findings of Fact ¶ 14). Neither defendant was affected in any way by the settlement agreement. (Findings of Fact ¶ 14). In other words, there is nothing to suggest that the defendants would have had anything to retaliate *for*.

Third, even if the defendants had, for some reason, wished to retaliate against the NAIL I lawsuit plaintiffs, there is no reason to think they would have chosen Grimm or Grimm Brothers Realty as targets. Despite his puffery, Grimm was a minor player in the NAIL I lawsuits. Indeed, it was only revealed at trial that

Grimm's organization, the Norristown Association of Investment Landlords (what we have referred to as NAIL II), is entirely distinct from the National Association of Investment Landlords (NAIL I), and that it was the latter organization that initiated and prosecuted the lawsuits. (Findings of Fact ¶¶ 4, 9). While Grimm was the publicity liaison for NAIL I during the pendency of the lawsuits, he was not known to the Borough as the public face of NAIL I, (Findings of Fact ¶ 11), and had no role in the legal proceedings surrounding the litigation. (Findings of Fact ¶ 11). Paul D. Perry, the man responsible for founding NAIL I and for initiating and prosecuting the NAIL I lawsuits, never felt he was retaliated against for his role in the litigation, which was clearly far greater and far more public than was Grimm's. (Findings of Fact ¶ 11, 15).

Plaintiff Grimm also failed in his burden to demonstrate that his April 6, 2000 suit in the Court of Common Pleas of Montgomery County to have the condemnation of 837 Swede Street lifted, (Findings of Fact ¶ 16), was a substantial or motivating factor in Sweeney's decision to continue the condemnation to the present day. This suit was filed after the condemnation had been in place for a full month. Although Sweeney was aware he was a named defendant in this suit, (Findings of Fact ¶ 16), there is no evidence that his requirements for lifting the condemnation became more stringent after the suit was filed. (Findings of Fact ¶¶ 28, 29, 32). If anything, Sweeney's offer of allowing Grimm to install a sprinkler system rather than remove the workshop from the basement or install a 2–hour fire-rated separation, made after April, 2000, made it easier for Grimm to get the condemnation lifted. (Findings of Fact ¶ 78).

vating factor in the decision to continue the condemnation.

Finally, the plaintiffs have been issued citations and condemnation orders long before the occurrence of the events which they claim form the basis of this action. (Findings of Fact ¶ 136). And after the events that form the basis of this action, both defendants acted amicably toward Grimm, O'Donnell by permitting, as a member of the Board of the Fire Department, NAIL II to hold its meetings at the firehouse, and Sweeney by appearing at a forum organized by NI. (Findings of Fact ¶¶ 18, 19). We find that there is no basis for drawing an inference that the plaintiffs' participation in the NAIL I lawsuits was the substantial or motivating factor in any of the defendants' decisions.

Even had we decided that the plaintiffs had satisfied their burden as an initial matter, we would decide that the defendants have put forward evidence rebutting any inference of retaliatory motive and clearly establishing non-retaliatory reasons for taking the actions they took. We have found that for each action taken by the defendants, their true motivation was not retaliatory but rather was based on a belief that a violation had in fact occurred, a condemnation was warranted or the action taken was proper. (Findings of Fact ¶¶ 26, 33, 35, 39, 40, 54, 58, 61, 65, 72, 82, 92, 97, 103, 107, 109, 115, 130, 135).

The plaintiffs did offer allegations that, if proven, would have rebutted some of the defendants' explanations. For example, Grimm maintained that he had reached an agreement with the Borough whereby the condemnation of 837 Swede Street would immediately be lifted in exchange for Grimm's mere commitment to installing a sprinkler system. Complaint ¶ 95; *Grimm*, 226 F.Supp.2d at 646–47. If proven, this allegation would have rebutted the defendants' claim that on September 20, 2000, September 26, 2000 and October 4, 2001, the individuals found occupying 837

Swede Street, (*see* Findings of Fact ¶¶ 52 54, 55–61, 66–72), were in fact present illegally in a condemned building. However, we have found that there clearly never was any such agreement and that Grimm knew it. (Findings of Fact ¶¶ 47–51).

Similarly, Grimm maintained that the Borough had received certification that the electrical system at 837 Swede Street was safe to re-energize on or about March 10, 2000. (Def.Exh.D–29, p. 27; Complaint ¶¶ 37–39). If proven, this allegation would have rebutted defendant Sweeney's defense that power to 837 Swede Street remained off because the entire building's electrical system was not certified as safe until November 27, 2000. As we noted in our Findings of Fact, Grimm's allegation is at odds with his concurrent claim that the first time he realized that Sweeney was requiring that the *entire* building's electrical system be certified was at trial. (Findings of Fact ¶ 28). It is also totally unsupported by the evidence. (Findings of Fact ¶¶ 30, 31 (noting no cut-card was ever received into evidence), 32).

Other examples of the plaintiffs' failure to overcome the defendants' evidence of non-retaliatory motives are set forth in detail in our Findings of Fact. (*See*, e.g., Findings of Fact ¶¶ 62, 64, 80, 85, 86, 110). In no case did the plaintiffs' evidence demonstrate that the defendants' proffered non-retaliatory explanations were pretextual or false.

The defendants have satisfied their burden to demonstrate that they would have taken the actions they took even in the absence of the plaintiffs' protected activities. *Trotman*, 635 F.2d at 224. We therefore find, as a matter of law, that none of the defendants' actions taken against the plaintiffs were taken out of a desire to retaliate against the plaintiffs for their involvement in the NAIL I lawsuits, for Grimm's suit to lift the condemnation

of 837 Swede Street or for Grimm's public comments regarding Borough code enforcement policies.

### 2. Substantive Due Process Claims

■ To succeed in a substantive due process claim under Section 1983, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 123 (3d Cir.2000); *Indep. Enters. v. Pittsburgh Water,* 103 F.3d 1165, 1179 n. 12 (3d Cir.1997). Ownership in and use and enjoyment of property are interests protected by substantive due process. *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 600–01 (3d. Cir.1995). We have already held that the plaintiffs had a protected property interest within the meaning of the Fourteenth Amendment. *Grimm,* 226 F.Supp.2d at 650–651 nn. 41, 43.

■ A violation of substantive due process rights on the part of an executive official is proven if the official's actions in depriving the plaintiff of a protected property interest were so arbitrary or egregious as to shock the conscience. *County of Sacramento v. Lewis,* 523 U.S. 833, 846–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The Third Circuit recently reaffirmed that in land-use cases where the actions of executive officials is at issue, the "shocks the conscience" standard applies. *United Artists Theatre Circuit v. Twp. of Warrington,* 316 F.3d 392, 400–01 (3d. Cir.2003).[31] The shocks the conscience

---

**31.** Plaintiffs argue that the *United Artists* court essentially misapplied *Lewis* because "the U.S. Supreme Court specifically limited [*Lewis*] to a high speed police chase." Plaintiffs' Letter Brief of January 21, 2003. We are unable to find any mention in *Lewis* of a limited holding. Indeed, it would be odd if the Court had intended to limit *Lewis* to such narrow circumstances given *Lewis's* extensive citation to precedent establishing the applicability of the shocks the conscience standard to executive action. *See Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708 (collecting cases and stating, "to this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.")

The plaintiffs' argument that *Lewis* did not supercede the Court's holding in *Arlington Heights v. Metropolitan Housing Devel. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), is not well taken. *Arlington Heights* was an equal protection case, not a substantive due process case, and, in any event, dealt with the actions of a legislative body rather than those of an executive official. *See* 429 U.S. at 263, 265, 97 S.Ct. 555. To the extent that *Arlington Heights* stated that there is a right to be free from arbitrary or irrational government action, 429 U.S. at 263, 97 S.Ct. 555 (discussing standing), *Lewis* applied the same rule of law but clarified that in cases dealing with executive officials, "only the

most egregious official conduct can be said to be arbitrary in the constitutional sense," 523 U.S. at 846, 118 S.Ct. 1708, i.e. "when it can properly be characterized as ... conscience shocking," 523 U.S. at 847, 118 S.Ct. 1708 (internal citations omitted).

The plaintiffs also contend that *United Artists* did not overrule the holding announced in *Bello v. Walker,* 840 F.2d 1124 (3d Cir.1988), and applied in subsequent cases, that a municipal land-use decision violates substantive due process when it is made for any reason "unrelated to the merits." *See United Artists,* 316 F.3d 392, 400 (discussing the "improper motive" standard and citing *Woodwind Estates Ltd. v. Gretkowski,* 205 F.3d 118 (3d Cir.2000); *Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253 (3d Cir.1995); *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592 (3d Cir.1995); *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685 (3d Cir.1993); *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667 (3d Cir.1991)). The *United Artists* panel considered this very argument and rejected it, primarily because, of all the cases applying *Bello's* improper motive standard, only *Woodwind Estates* came after the Supreme Court's decision in *Lewis,* and that case did not so much as mention the glaring conflict between *Lewis* and *Bello.* 316 F.3d at 400–01. We have neither the power nor the inclination to overrule the Third Circuit on this point. We therefore apply the clear pre-

standard "is no calibrated yardstick," *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708, thus, conduct that "shocks in one environment may not be so patently egregious in another." *Id.* at 850, 118 S.Ct. 1708. For example, while deliberate indifference to a pre-trial detainee's medical needs may sometimes be conscience-shocking, *Barrie v. Grand County, Utah,* 119 F.3d 862, 867 (10th Cir.1997), in school discipline cases, the question is " 'whether the force applied caused injuries so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Jones v. Witinski,* 931 F.Supp. 364, 369 (M.D.Pa. 1996) (quoting *Webb v. McCullough,* 828 F.2d 1151, 1158 (6th Cir.1987)). We need not delve deeply into the contours of the standard, however, to conclude that none of the defendants' conduct even approaches the level of culpability necessary to satisfy it.

Before turning to our discussion of the actions taken by the defendants, it is important to note that, as a general matter, the impact on our ruling of a dismissal or not guilty finding on any given citation by a District Justice or Court of Common Pleas Judge is minimal. It does not follow from such a finding that the plaintiffs' substantive due process rights were violated by the issuance of the citation, because the finding, at most, demonstrates that the

Borough failed to prove beyond a reasonable doubt that the plaintiffs committed the violation. *See Rich v. Bailey,* No. 95–6932, 1996 WL 745298, *5 (E.D.Pa. Dec. 23, 1996).[32] Such a ruling has no bearing on whether there was probable cause to issue the citation in the first instance or on whether the issuance of the citation was arbitrary, irrational and shocking to the conscience, and vice-versa. *See Lewis,* 523 U.S. at 854 n. 14, 118 S.Ct. 1708 ("To say that due process is not offended by the police conduct described here is not, of course, to imply anything about its appropriate treatment under state law.").

▌ The plaintiffs have not explicitly called into question whether the defendants had probable cause to issue the numerous citations challenged in this case.[33] However, the question of whether Sweeney and O'Donnell had probable cause to issue those citations is clearly relevant to the question of whether they issued them in violation of the plaintiffs' substantive due process rights. "Probable cause exists where the facts and circumstances within [an officer's] knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) *quoting Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Applying this standard to the Findings of Fact that we have made, it is

cedent laid out in *Lewis* and *United Artists* and apply the shocks to the conscience standard in evaluating the defendants' actions.

**32.** Violations of municipal building codes are summary offenses. *Com. v. Karn,* 168 Pa. Cmwlth. 435, 650 A.2d 1176, 1178 (1994). A defendant charged with a summary offense is entitled to a presumption of innocence and to have their case decided under the "beyond a reasonable doubt" standard. *Com. v. Waga-*

*man,* 426 Pa.Super. 396, 627 A.2d 735, 737 (1993); *Com. v. Karl,* 340 Pa.Super. 493, 490 A.2d 887, 890–91 (1985).

**33.** The issuance of a citation must be predicated upon probable cause because citations noticing violations of borough ordinances are summary offenses, and are criminal in nature. Pa. R.Crim. P. 405 and 410.

clear that the defendants had probable cause to issue each citation.

### a. The initial decision to condemn 837 Swede Street

837 Swede Street was severely damaged by smoke, fire and water during the March 7, 2000 fire. (Findings of Fact ¶ 25). Even the plaintiffs' expert agrees that Sweeney's initial decision to condemn the building was reasonable and an appropriate use of the Borough codes. (Findings of Fact ¶ 26; 11/21/02 tr. at 107). The March 7, 2000 condemnation was neither arbitrary nor irrational and did not shock the conscience.

### b. The continued denial of electrical service to 837 Swede Street

The plaintiffs failed to prove that the Borough received an electrical cut-card certifying the safety of the entire electrical system before November 27, 2000, the date of receipt the Borough offers. (Findings of Fact ¶ 31). In fact, despite Grimm's protestations to the contrary, none of the inspections performed by Gambino Electric or MDIA ever certified the entire electrical system as safe until late October, 2000. (Findings of Fact ¶¶ 30, 31, 38).[34] Grimm knew that the entire building's electrical power had not been certified. (Findings of Fact ¶ 28, 32). Sweeney was not the Borough official responsible for verifying the receipt of a cut-card certifying the entire building; to the extent he ever stated that the electrical system had been certified, he had no authority to do so, and was merely relaying information given to him by Lynn Bixler. (Findings of Fact ¶ 37). Sweeney acted within a reasonable time after learning of the receipt of a cut-card to notify PECO that power could be restored and to notify Grimm, as a courtesy, that he should contact PECO to have the electrical power turned back on. (Findings of Fact ¶ 39).

In the time between the fire and the restoration of power in December, 2000, Grimm illegally jumped power from one building to another, (Findings of Fact ¶ 34), and illegally installed and powered four new meters to provide electrical power to tenant apartments. (Findings of Fact ¶ 35). Sweeney's response to these illegal actions was reasonable and appropriate. (Findings of Fact ¶ 35). Despite Grimm's illegal actions, he was granted a permit to install a temporary electric work panel the very same day he was found to be illegally jumping power. (Findings of Fact ¶ 34). This permit expired and power was terminated without any intervention on Sweeney's part. (Findings of Fact ¶ 36).

We find as a matter of law that the continued disconnection of electrical power to 837 Swede Street, the warning issued on March 15, 2000 regarding the illegal jumping of power and the September 18, 2000 termination of power to the tenant apartments were neither arbitrary nor irrational and did not shock the conscience.

### c. 837 Swede Street—September 20, 2000 Citation

When O'Donnell and McKeon arrived at 837 Swede Street, it was clear that there was a meeting in progress. (Findings of Fact ¶ 52). Both men knew the building was condemned at that point. (Findings of Fact ¶¶ 52, 54). The building was, indeed, still condemned; there had never been an agreement to lift the condemna-

---

**34.** If Grimm is to be believed, and we do not believe him, the first time he ever understood that Sweeney was requiring the entire building to be certified was at trial. (*See* Findings of Fact ¶ 28). If this were the case, we are at a loss to understand how he could have asked his inspectors or underwriters to certify the entire building prior to trial.

tion. (Findings of Fact ¶¶ 49–51, 53). Grimm knew perfectly well that the condemnation had not been lifted. (Findings of Fact ¶ 53). O'Donnell issued a citation for allowing people to occupy a condemned building because his supervisor ordered him to, (Findings of Fact ¶ 52), and because he knew that the building was condemned and there were people occupying it. He had probable cause to believe a violation was being committed. His decision was neither arbitrary nor irrational and did not shock the conscience.

### d. 837 Swede Street—September 26, 2000 Citation

O'Donnell and Tims both believed that tenants were living at 837 Swede Street and found ample evidence to support their belief. (Findings of Fact ¶ 59). There were, in fact, tenants living there at that time, and Grimm knew it—he admits to having allowed tenants to begin moving back in. (Findings of Fact ¶¶ 59–60). Grimm knew perfectly well that it was illegal for tenants to occupy the building because it was still condemned. (Findings of Fact ¶¶ 49–51, 53, 55–56, 60). Tims knew the building was still condemned, and he ordered O'Donnell to write a citation for allowing tenants to occupy a condemned building. (Findings of Fact ¶ 59). Tims also ordered O'Donnell to find the tenants alternative housing, which he did. (Findings of Fact ¶ 58). The citation was supported by probable cause. O'Donnell's decisions to issue the citation and to call other Norristown landlords were neither arbitrary nor irrational and did not shock the conscience.

### e. 837 Swede Street—The Sprinkler Plan

Sweeney needed a complete, NFPA 13 compliant sprinkler installment plan in order to have it reviewed by a third-party certification agency. (Findings of Fact ¶ 63). Grimm never submitted a complete sprinkler plan and made no good faith effort to do so. (Findings of Fact ¶¶ 62, 64). Sweeney's inability to submit Grimm's unsatisfactory applications for review prevented him from approving those applications. (Findings of Fact ¶ 65). The ongoing decision, if it can be properly termed as such, not to approve Grimm's inadequate applications was neither arbitrary, irrational nor shocking to the conscience.

### f. 837 Swede Street—October 4, 2001 Citation

On October 4, 2001, O'Donnell and Sweeney were both told by Detective Bernstiel that he had received complaints that tenants were living in 837 Swede Street and paying rent to Grimm, that extension cords were being used to provide permanent power to the apartments and that children were present in what was clearly a hazardous situation. (Findings of Fact ¶ 67). This provided sufficient reason to perform an inspection. Bernstiel, as the coordinator of the CLEAN team, took Sweeney and O'Donnell with him on a CLEAN team inspection of 837 Swede Street. (Findings of Fact ¶ 68). They discovered ample evidence indicating that there were tenants occupying the building and that extension cords were being used to supply permanent power to their apartments. (Findings of Fact ¶¶ 68–71). We have found that there were, in fact, tenants living there illegally and using extension cords as a source of permanent power. (Findings of Fact ¶ 72). Sweeney knew that the building remained condemned and that both the occupancy by the tenants and the use of extension cords in this manner were illegal. (Findings of Fact ¶ 70). Given this evidence, Sweeney's and O'Donnell's decisions to write two citations, one for allowing tenants to occupy

the building illegally and one for using extension cords as a source of permanent power, were neither arbitrary nor irrational and did not shock the conscience. Both citations were supported by probable cause.

g. 837 Swede Street—The Two–Hour Fire–Rated Separation Requirement

It is important before delving into a discussion of whether Sweeney's insistence on a two-hour fire-rated separation between the basement and first floor of 837 Swede Street violated Grimm Brothers Realty's due process rights, to note once again the limited nature of our inquiry. Grimm Brothers Realty has directly challenged the applicability of the Borough building and existing structures codes in state court. (Findings of Fact ¶ 16). Two motions to lift the condemnation via a temporary restraining order have failed, a third is pending, and the court has not reached a final decision on the merits of the condemnation. (Findings of Fact ¶¶ 16, 44, 45, 46). The challenge before us is not to the applicability of the Borough building codes to 837 Swede Street, but rather to the constitutionality of Sweeney's decision to keep the condemnation order in place. The constitutionality of his decision is to be judged, as we have stated, on a shocks the conscience standard. Our limited inquiry into how the Borough codes ought to be interpreted is relevant only to a determination of whether Sweeney's interpretation that they require a two-hour fire-rated separation (and his concomitant insistence that the condemnation order remain) shocks the conscience. In finding that Sweeney's decision, and the interpretation underlying it, do not shock the conscience, we express no opinion as to whether the codes truly do require a two-hour fire-rated separation. *See Lewis* 523 U.S. at 854 n. 14, 118 S.Ct. 1708.

At all times relevant to this case, Sweeney believed that the existing structures codes of 1981 and 1987, the BOCA building code of 1967 and 1990 and/or the fire prevention code of 1978 include provisions to bring grandfathered buildings up to code by requiring that any time an element, such as a ceiling, is repaired or altered in whole or in part, the entire element must be brought up to modern building code standards. (Findings of Fact ¶ 77, 78). This belief, at least with regard to the 1981 and 1987 codes, is fully supported by even a brief glance at the codes in question. (*See* Findings of Fact ¶ 79).

Plaintiffs appear to dispute the fact that an alteration, within the meaning of the BOCA codes, was ever made to the basement. Their argument is without merit. First, both alterations and repairs trigger the requirement of bringing the subject of the alteration or repair up to date. (1987 ESC 102.1). Second, the claim that the term "alteration" applies only to "structural members," which do not include ceilings, ignores the fact that the definition of "alteration" found at BOCA Basic Building Code ("BBC") 201.0 refers to "structural parts." Although "structure" and "structural" are defined terms, "parts," is not, *see* BOCA BBC 201.0. Thus, section 204.0 of the 1990 BBC's admonition that "terms . . . not defined through the methods authorized in this section . . . shall have ordinarily accepted meanings such as the context implies," demands that "structural parts" means, literally, parts of "that which is built or constructed," BOCA BBC 201.0, and must be read to include ceilings. Finally, Plaintiffs make much of the fact that ESC 105.0 requires only that alterations and repairs "caused directly or indirectly by the enforcement of this code" trigger the updating requirement. They ignore, however, ESC 102.1, which applies to all alterations and repairs. Even their own expert agrees that this section re-

quires that any repair or alteration in an existing structure be performed in conformance with modern code. (11/21/02 tr. at 140).[35]

We have found that Grimm made alterations to the basement ceiling when he cut holes in it to run ducting and piping in the process of converting the second floor banquet hall and meeting room to apartments. (Findings of Fact ¶ 80). These alterations were done in 1983 or 1986, after the 1981 BOCA Building Code and Existing Structures Code had been adopted by the Borough. (Findings of Fact ¶¶ 79, 80). Even if Grimm did not cut into the basement ceiling at that time, Sweeney's belief that he had, especially given Grimm's utter lack of credibility on this issue, not only does not shock the conscience, but is reasonable. (Findings of Fact ¶ 80, 81). Sweeney's faith in the correctness of his interpretation was bolstered by Rosen's findings that there had indeed been an alteration in the basement ceiling, that the codes required that altered or repaired structural parts be brought up to modern standards upon alteration or repair, and that Grimm was therefore required to install a two-hour fire-rated separation in his basement. (Findings of Fact ¶ 77).

In light of all of the evidence and our examination of the relevant building and existing structures codes, we find that neither Sweeney's interpretation of the codes nor his belief in their applicability to Grimm were arbitrary, irrational or shocking to the conscience. We therefore conclude as a matter of law that Sweeney's decision to keep the condemnation in place is neither irrational nor arbitrary and does not shock the conscience.

### h. 837 Swede Street—April 19, 2000 Citation

Sweeney and Lynn Bixler were both made to wait while they observed Grimm carrying on what they believed to be a telephone conversation related to normal business operations. (Findings of Fact ¶ 83). Sweeney also saw two individuals carrying out what he believed to be normal business operations. (Findings of Fact ¶ 84, 87). Sweeney knew that, as Grimm admits, Grimm conducted business from 837 Swede Street despite the fact that it was condemned. (Findings of Fact ¶ 86). Sweeney also saw what he believed to be convincing evidence that individuals were living in apartment number four, and we find that there were people living in that apartment. (Findings of Fact ¶ 84, 85).

Sweeney was shocked by Grimm's apparent disregard for the condemnation order still in effect. (Findings of Fact ¶ 89). In all of Sweeney's experience as a code enforcement officer, he has never seen a landlord use a condemned space for records reconstruction, and it was clear to him that the secretary and data-entry clerk were, in fact, engaged in routine business operations. (Findings of Fact ¶ 87). Sweeney's decision not to warn Grimm that he was going to cite him for allowing workers in a condemned space

---

**35.** Plaintiffs also cannot rebut the fact that Grimm made alterations to the ceiling in 1999, when he added only one layer of 5/8 inch code drywall, which provides one hour of fire rating, to only portions of the ceiling. (Findings of Fact ¶ 73, 81). Their own expert agrees that this was an alteration. (11/21/02 tr. at 133). This would trigger the application of the updating provisions. (Findings of Fact ¶ 81).

In addition, Sweeney believed that the plaster lath ceiling offered, when it was unbroken, a fire-rated protection of approximately 45 minutes and was required by code when it was installed. (Findings of Fact ¶ 75). It is undisputed that the 1981 BOCA Basic Property Maintenance Code, Section 703.1 requires that the fire-rated resistance of fire-rated ceilings must be preserved.

was based on his certain knowledge that Grimm already knew it was illegal to have workers in that space. (Findings of Fact ¶ 88). Sweeney's decision to cite Grimm was appropriately based on the evidence he believed established a violation. (Findings of Fact ¶ 90).

Although Grimm was eventually found not guilty of the citation, (Findings of Fact ¶ 91), this fact alone does not prove that Sweeney's action was arbitrary, irrational and shocked the conscience. Sweeney decided to issue the citation knowing that the legality of Grimm's conduct would ultimately be decided by an impartial judiciary. (Findings of Fact ¶ 90). Nevertheless, he believed that a violation had occurred, and we find that there was probable cause to support this belief. (Findings of Fact ¶ 90). Accordingly, Sweeney's decision to issue a citation was supported by probable cause, was neither arbitrary nor irrational and did not shock the conscience.

i. 837 Swede Street—April 30, 2000 Citation

When Sweeney saw Grimm entering 837 Swede Street on April 30, 2000, he knew that Grimm could have been entering for a lawful purpose. (Findings of Fact ¶ 96). However, he observed that Grimm was not dressed appropriately for performing repairs, that Grimm was walking his dog, and that it was Sunday morning. (Findings of Fact ¶ 94). These factors led him to conclude that Grimm was not entering the building to perform repair or rehabilitation work, but was in fact entering the building for an impermissible purpose. (Findings of Fact ¶ 96). He issued a non-traffic citation for illegally entering a condemned building because he believed a violation had occurred. (Findings of Fact ¶ 96).

The fact that this citation was dismissed by a District Justice does not require a finding that it was issued in violation of Grimm's substantive due process rights. It may have been imprudent of Sweeney to issue a citation without being sure that there Grimm was, in fact, violating the law by entering 837 Swede Street. However, probable cause does not require certainty. We believe that a man of reasonable caution in Sweeney's situation would have been reasonable in believing that a violation was occurring. Given Grimm's violation only eleven days earlier, his apparent disregard for the ongoing condemnation and Sweeney's observations of Grimm that day, we cannot say that the issuance of the citation was without probable cause, arbitrary, irrational or shocking to the conscience.

j. 839 Swede Street—July 17, 2000 Citation

O'Donnell mailed Immediate Action Required notices requiring that weeds and plants be cut back within two days to forty landlords, and ten landowners in addition to Grimm were cited for non-compliance within the timeframe given. (Findings of Fact ¶ 101). O'Donnell cited Grimm on July 17, 2000 for having failed to maintain his property in conformance with the Immediate Action Required notice because when he visited the property on that day, it was clear that the weeds that were obstructing pedestrians' view of the road were still there and had not been cut back. (Findings of Fact ¶ 99). O'Donnell had probable cause to issue the citation. Although Grimm was eventually found not guilty of the citation because a judge found he had not been given enough time to comply with the Immediate Action Required notice, we do not find that the citation was so egregious as to be arbitrary, irrational or conscience-shocking.

k. 857 Cherry Street—Condemnation of Basement and August 10, 2000 Citation

Wakefield requested that O'Donnell inspect the basement of 857 Cherry Street because it was unsanitary and unsafe. (Findings of Fact ¶ 104). O'Donnell found numerous code violations including blatant safety and sanitary deficiencies. (Findings of Fact ¶ 105). He condemned the basement on the basis of the eleven serious violations he found. (Findings of Fact ¶ 108). The condemnation was neither arbitrary, irrational nor conscience-shocking.

O'Donnell also found that, as Grimm has admitted, Grimm did not have a use and occupancy certificate for Wakefield's tenancy. (Findings of Fact ¶ 106). He issued a citation for failing to have a use and occupancy certificate on this basis. (Findings of Fact ¶ 107). The issuance of this citation was supported by probable cause and was neither arbitrary, irrational nor conscience-shocking.

l. 857 Cherry Street—August 25, 2000 Citation

O'Donnell was trained by his supervisors to require anyone wishing to enter a condemned building to first obtain a permission slip from a code enforcement officer. (Findings of Fact ¶ 111). The purpose of this system is to allow police officers to know, when they find an individual in a condemned building, whether that individual is there for a legal purpose. (Findings of Fact ¶ 111).[36] Grimm never properly applied for a permission slip to do work at

857 Cherry Street though he knew that one was required. (Findings of Fact ¶¶ 112–114). When O'Donnell found Grimm Brothers Realty workers at 857 Cherry Street on August 25, 2000, he cited Grimm Brothers Realty for allowing them to enter a condemned building. (Findings of Fact ¶ 114).

Given that O'Donnell had been trained that Borough policy required individuals such as those he found at 857 Cherry Street to have a signed permission slip and that it is undisputed that they did not have one, we cannot say that his decision to issue a citation was unsupported by probable cause or was arbitrary, irrational or conscience-shocking. In essence, O'Donnell was doing what he had been trained to do.[37] Furthermore, the citation was withdrawn by the Borough. (Findings of Fact ¶ 114). Even if we had found some due process violation in O'Donnell's actions, the plaintiffs demonstrated no harm that came of it.

m. 857 Cherry Street—October 11, 2000 Citation

When O'Donnell arrived at 857 Cherry Street on October 10, 2000 to conduct a multiply rescheduled follow-up inspection to his August 14, 2000 Operation Fresh Start Inspection, nobody was there to let him in. (Findings of Fact ¶ 126). Grimm had previously informed O'Donnell that he was denying the Borough any further access to Grimm Brothers Realty properties. (Findings of Fact ¶ 124). Throughout the dispute regarding the inspections of 857

---

**36.** If the work being performed by such an individual did not require a permit, they would have no means of proving the legitimacy of their presence other than by showing that they had a signed permission slip.

**37.** We do not intend to implicate the defendants' qualified immunity defense by our reference to O'Donnell's training in this regard.

Rather, we discuss O'Donnell's training to demonstrate that his state of mind was not one entertaining a decision intentionally, wrongfully, or conscience-shockingly to inflict harm upon the plaintiffs, but rather to demonstrate his subjective belief that he was merely doing what was required of him by Borough policy.

Cherry Street, O'Donnell never understood that Grimm claimed he had not received his initial August 14, 2000 inspection report regarding the apartments or that Grimm believed O'Donnell was attempting to inspect the basement. (Findings of Fact ¶ 124). In fact, none of Grimm's correspondence with O'Donnell ever requested a copy of the August 14, 2000 inspection report, but rather only requested copies of the notice scheduling the inspections for Grimm's files. (Findings of Fact ¶ 124). In light of the apparent misunderstanding in this regard, we cannot say that O'Donnell's failure to send Grimm another copy of the August 14, 2000 inspection report was arbitrary, irrational or conscience-shocking.

O'Donnell decided to cite Grimm for refusing access for a lawful inspection because nobody was present to let him into 857 Cherry Street. (Findings of Fact ¶ 130). O'Donnell believed that Borough Ordinance 87–10 Section 105.3.2.1 provided him the authority to issue a citation to a landlord who refuses access for a lawful inspection, and he issued a citation under this code provision. (Findings of Fact ¶ 127, 128). O'Donnell had probable cause to issue the citation, given that it was clear that Grimm was not providing access for the inspection. We find that the citation was neither arbitrary nor irrational and did not shock the conscience.

O'Donnell obtained a valid search warrant to inspect 857 Cherry Street to determine whether the corrections and repairs noted in his August 14, 2000 inspection report had been made. (Findings of Fact ¶ 131). We have found, despite Grimm's claims to the contrary, that O'Donnell did not break into 857 Cherry Street and that the damage caused during the inspection was done by the police officers who accompanied him. (Findings of Fact ¶ 132–133). Moreover, because, for example, two of Grimm's workers refused access to the apartment in which they were hiding, the damage done to the interior doors was necessary to effectuate the valid search warrant. (Findings of Fact ¶ 133). We therefore conclude that neither O'Donnell's conduct during the search nor the search itself were not arbitrary or irrational and that they did not shock the conscience.

O'Donnell found during his search that none of the code violations and corrections he had listed in his August 14, 2000 inspection report had been corrected. (Findings of Fact ¶ 134). Given the apparent misunderstanding regarding Grimm's receipt of that inspection report, (Findings of Fact ¶ 124), we do not think that O'Donnell's issuance of a citation for having failed to make repairs lacked probable cause or was arbitrary, irrational or conscience-shocking.

3. *Fourth Amendment Claim—October 11, 2000 Citation*

Grimm Brothers Realty challenges O'Donnell's issuance of the October 11, 2000 citation for refusing the Borough access to 857 Cherry Street for a lawful inspection on the basis that O'Donnell's action violated its right under the Fourth Amendment to be free from unreasonable searches. At the outset, we must emphasize that the Borough of Norristown was dismissed from this action at summary judgment. *Grimm*, 226 F.Supp.2d at 659. In alleging municipal liability on the part of the Borough, the plaintiffs never discussed this citation. They never challenged the constitutionality of the Borough ordinance underlying it, 87–10 Section 105.3.2.1, (*see* Findings of Fact ¶ 127), or discussed the relationship between the Borough and O'Donnell's interpretation of, or training with regard to, that ordinance in the context of municipal liability issues. Similarly, neither party argued that we

should abstain from hearing Grimm Brothers Realty's claims with regard to this citation on the basis of any abstention doctrine. Rather, the defendants argued that we should abstain from hearing any of the plaintiffs' claims on the basis only of Grimm's lawsuit to lift the condemnation of 837 Swede Street.[38] We therefore consider whether O'Donnell violated Grimm Brothers Realty's constitutional rights in issuing the October 11, 2000 citation for refusing access for a warrantless search.

### a. The Fourth Amendment Right Not to Consent to a Warrantless Search

■ As we found in our summary judgment opinion, the October 11, 2000 citation was unlawful under the Supreme Court's decision in *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 540, 87 S.Ct. 1727, 18 L.Ed.2d 930·(1967). *Grimm*, 226 F.Supp.2d at 640 ("We find, therefore, that as a matter of law, the issuance of the citation was improper.") A commercial landowner may not be prosecuted for refusing to consent to an inspection in the absence of a warrant. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 541, 546, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967). This is true even when the inspection is merely a followup of a previous warranted or otherwise lawful inspection. *See Michigan v. Tyler*, 436 U.S. 499, 511, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (hold-

ing that, after exigency of determining the source of a fire has passed, further follow-up investigations for arson require either consent or a warrant.) Having determined that the citation violated Grimm Brothers Realty's right not to consent to an unlawful search, we consider O'Donnell's affirmative defense of qualified immunity.

### b. Qualified Immunity

Government officials are shielded from liability if their conduct does not violate "clearly established statutory or constitutional rights" of which a reasonable public official would be aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999). A constitutional or statutory right is "clearly established" when it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151, or when "a reasonable official would understand that what he is doing

---

**38.** Although we have the power, *sua sponte* to abstain on the basis of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *see Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), 143 n. 10, we would not do so in this case. First, there is no ongoing proceeding within the meaning of *Younger*. More than two years have passed since the issuance of the citation, and, according to Grimm, the Borough has not acted on it since his initial conviction was vacated. (Findings of Fact ¶ 127). There is no evi-

dence that the Borough, at this late date, still intends to prosecute Grimm on the basis of the citation, and we find it unlikely that they would do so in light of the time limitations set forth in the Pennsylvania Rules of Criminal Procedure. *See* Pa.R.Crim.P. Rule 600(D)(1) (A new trial granted by a trial court shall commence within 365 days). Second, Grimm seeks only money damages, which would prevent us from dismissing this claim in any case. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 719, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

618

violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

Thus, qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [has] indicated that in such cases those officials—*like other officials who act in ways they reasonably believe to be lawful*—should not be held personally liable." *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 (emphasis added).

 In light of these standards, we find that O'Donnell is entitled to qualified immunity for issuing the October 11, 2000 citation. O'Donnell relied on Borough code section 105.3.2.1 in issuing the citation. (Findings of Fact ¶ 127). He read this section, which provides for penalties and fines whenever a landlord fails to comply with the Right of Entry section of the Existing Structures Code, ESC section 105.3.2 (adopted as Borough Code 87–10 section 105.3.2), (Findings of Fact ¶ 128), to say that whenever a landlord refuses access for a lawful inspection of tenant apartments, the code enforcement officer who wishes to conduct the inspection may cite him for noncompliance with the Borough Code.

First, we do not believe that that Grimm Brothers Realty's right not to consent to a

warrantless inspection of tenant apartments, *for the benefit of the tenants*, is clearly established.[39] Although *Camara* held that an individual may not be cited for refusing access to a warrantless search, it did so with respect to a *tenant's* right not to consent despite the consent of her *landlord* to such a search. *Camara*, 387 U.S. 523, 525, 87 S.Ct. 1727. If a tenant has the authority to object to a warrantless inspection of her apartment, even after a landlord has consented to the entry of an inspector into the building, we think that it is obvious that a tenant has the authority to consent to a warrantless inspection of her apartment, even after a landlord has refused entry to an inspector. We believe that on this basis, a reasonable Borough code enforcement official would not have understood that citing Grimm for refusing access to search the building's apartments was unlawful. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

Moreover, Grimm Brothers Realty was operating a commercial establishment at 857 Cherry Street, and the Fourth Amendment applies only to nonpublic areas of commercial properties. *See*, 387 U.S. at 545, 87 S.Ct. 1737; *Warrington Twp. v. Powell*, 796 A.2d 1061, 1069–70 (Pa. Cmwlth.2002) ("[T]here is no impediment to [a] township's inspection of any portion of [a commercial landowner's] premises that are open to the public."); *Com. v. Feineigle*, 690 A.2d 748 (Pa.Cmwlth.1997). We acknowledge that an apartment building's hallways are not open to the general

**39.** Our holding that the citation violated Grimm Brothers Realty's constitutional rights does not require that Grimm Brothers Realty had the authority to refuse access to the tenant apartments for a lawful inspection. It merely establishes that to the extent Grimm did refuse access to his building, he could not be cited for noncompliance. There was neither consent nor non-consent by any tenant on October 10, 2000 for O'Donnell's entry to

conduct an inspection. (*See* Findings of Fact ¶ 127). We are therefore not presented with the question of whether a landlord may legally block access for an inspection that has been consented to by a tenant, though we are inclined to think they may not. In such a case, we might well find that issuing a citation to the landlord would not be unlawful. However, we emphasize that we are not faced with such a situation here.

public, but rather only to tenants and their guests. Nevertheless, especially in light of the fact that the inspection was for the safety and benefit of the tenants, (*see* Findings of Fact ¶¶ 119, 122), we rule that a reasonable Borough code enforcement official could certainly have believed that a landlord had no right to refuse entry for an inspection of the apartments, and that such a landlord could be cited for obstructing access to tenant apartments for a duly authorized inspection under Borough Ordinance 87–10 section 105.3.2.1.

To the extent that O'Donnell's belief that Borough Ordinance 87–10 section 105.3.2.1 authorized him to cite Grimm for refusing access to the building in order to perform an inspection of the tenants' apartments was incorrect, we rule that his mistaken reliance on that ordinance should not subject him to liability. *See Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. On its face, Borough Ordinance 105.3.2.1 could reasonably be read to authorize O'Donnell to issue the citation.[40] Police officers are entitled to rely on a statute duly adopted by a municipality that is or later turns out to be unconstitutional. This rule was first announced by the Supreme Court before it adopted the objective reasonableness standard laid out in *Harlow. See Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("A policeman[ ]" should be "excused . . . from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied."). However, the rule has survived *Harlow* as a method of measuring the

reasonableness of an official's conduct. As one Court of Appeals has stated, "police officers on the street are ordinarily entitled to rely on the assumption that [city] council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority." *Grossman v. City of Portland,* 33 F.3d 1200, 1209–10 (9th Cir.1994); *Malachowski v. City of Keene,* 787 F.2d 704, 713–14 (1st Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *see Lederman v. United States,* 291 F.3d 36, 47 (D.C.Cir.2002) (*citing Grossman*). This is so unless the ordinance is "patently violative of fundamental constitutional principles." *Grossman,* 33 F.3d at 1209.

O'Donnell is a Bureau of Code Enforcement officer, not a police officer. He has had no legal training. (Findings of Fact ¶ 129). This is presumably also true of any other code enforcement officer, including our hypothetical "reasonable" officer. In contrast to police officers, who generally receive training in the legal and constitutional issues involved in law enforcement, code enforcement officers receive training in fire, health and safety issues. We believe that code enforcement officials, to an even greater extent than police officers, should be entitled to rely on borough ordinances even when those ordinances may in fact be unconstitutional on their face or as applied.

In this case, O'Donnell relied on more than the Borough ordinance to conclude that he had the authority to cite Grimm. O'Donnell had issued similar citations in

---

**40.** We again note that neither plaintiff has made a facial challenge to Borough Ordinance 87–10 section 105.3.2.1, and that the Borough is no longer a party to this action. We therefore explicitly do not hold that the statute violates the Constitution. Indeed, one plausible reading of the ordinance is that it authorizes code officials to cite a landlord for

refusing access for an inspection for which the officer has obtained a warrant. *Grimm,* 226 F.Supp.2d at 640. Another is that it authorizes code officials to cite a landlord for refusing access to tenant apartments when tenants have consented to an inspection. *See supra* note 39.

the past without rebuke and it is of crucial importance that previous citations issued under this ordinance to landlords who refused to consent to warrantless searches have been reviewed and approved by judges of the Court of Common Pleas. (*See* Findings of Fact ¶¶ 128, 129). With this in mind, we find that a reasonable code enforcement official could not have known that issuing a citation to Grimm would be "patently violative of fundamental constitutional principles." *Grossman,* 33 F.3d at 1209.

Having no training in legal issues, armed with the knowledge that state court judges had previously found that this ordinance authorized citations issued for refusals to consent to warrantless searches, and intending to inspect tenant apartments for health and safety concerns, we find that an objectively reasonable code enforcement officer in O'Donnell's position would not have understood that issuing a citation to Grimm Brothers Realty for refusing access to tenant apartments to conduct a duly authorized inspection violated Grimm Brothers Realty's rights. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. O'Donnell was neither incompetent nor willful in issuing an unlawful citation—he was merely mistaken, and as such, he is protected by qualified immunity. *Malley,* 475 U.S. at 341, 106 S.Ct. 1092.

### 4. Damages

Even had we found that O'Donnell was not entitled to qualified immunity, we would rule that Grimm Brothers Realty is not entitled to any relief. Grimm Brothers Realty has not proven that it suffered any injury as a result of the citation. As Grimm testified, the citation was never prosecuted to conclusion and Grimm Brothers Realty therefore never had to pay a fine. (Findings of Fact ¶ 127). Grimm's paltry testimony regarding moneys he spent in defending himself against prosecution for his multiple code violations would be insufficient as a matter of law to prove damages in this instance. (*See* Findings of Fact ¶ 138 & notes 23, 24). We therefore would not award compensatory damages even had we found that O'Donnell was not entitled to qualified immunity.[41]

### C. Pendent State Claim Under Article I, Section 8 of the Pennsylvania Constitution

Following our summary judgment opinion, the plaintiffs were permitted to move

**41.** We note that the plaintiffs have demanded attorneys fees as part of their damages, presumably pursuant to 42 U.S.C. § 1988, which provides that the court may, *in its discretion,* award reasonable attorneys fees to a prevailing party. 42 U.S.C. § 1988. Given that we would not award damages to Grimm Brothers Realty on this claim in any event, Grimm Brothers Realty would not be a prevailing party within the meaning of 42 U.S.C. § 1988. *Hewitt v. Helms,* 482 U.S. 755, 762, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). Even if we awarded nominal damages, attorneys fees would be inappropriate. *Farrar v. Hobby,* 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("In some circumstances, even a plaintiff who formally 'prevails' under [42 U.S.C.] § 1988 should receive no attorney's fees at all. A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party.") The degree of success obtained by the plaintiffs, should we have found that O'Donnell was not entitled to qualified immunity, in comparison to the relief they sought, would be minuscule. The core of the plaintiffs' Complaint were the First Amendment and Substantive Due Process claims, and they sought a total of $900,000 from the three initial defendants. Because " 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained,' " *Farrar,* 506 U.S. at 114, 113 S.Ct. 566 *quoting Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), we would not award any attorney fee even had we found O'Donnell liable for nominal damages.

forward with their claim that the defendants had no basis for condemning either 837 Swede Street or the basement of 857 Cherry Street and therefore violated Grimm Brothers Realty's right under Article I, Section 8 of the Pennsylvania constitution to be free from unreasonable seizures of property. *Grimm,* 226 F.Supp.2d at 656–57; *see* Pa. Const. Art. I, § 8 ("The people shall be secure ... from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue ... without probable cause."). We allowed this claim because there were disputed issues of fact material to the legal issue of whether the condemnation orders were properly issued or were, instead, issued in retaliation for the plaintiffs' First Amendment activities or in violation of the plaintiffs' substantive due process rights. *Grimm,* 226 F.Supp.2d at 659. Because we have found that the condemnation orders were properly issued, and were not the result of retaliatory motive or arbitrary, irrational or conscience-shocking decisions, we find that they did not result in unreasonable seizures of Grimm Brothers Realty's property. In addition, because we have found that Sweeney's decision to keep the condemnation order in place at 837 Swede Street was reasonable, non-retaliatory and not in violation of Grimm Brothers Realty's substantive due process rights, we find that it also has not resulted in an unreasonable seizure of Grimm Brothers Realty's property.

### D. Qualified Immunity

Defendants have argued that even if they were found to have violated the plaintiffs' constitutional rights, they would be entitled to qualified immunity. We have found that none of the defendants' actions, other than the October 11, 2000 citation, violated any of the plaintiffs' rights. *See supra* section IV.B. We have already de-

cided that O'Donnell is protected by qualified immunity for the October 11, 2000 citation. *See supra* Part IV.B.3.b. We need not consider the defense of qualified immunity for any of the defendants' other actions. *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (noting that in deciding a motion for summary judgment, if the plaintiff's allegations, if established, would not establish the violation of a constitutional right, there is no need for further inquiry regarding qualified immunity.)

### V. CONCLUSIONS OF LAW

Consistent with the above findings of fact and discussion, we make the following conclusions of law:

1. Our federal question jurisdiction is based upon 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

2. Our supplemental jurisdiction to hear the plaintiffs' state law claims is based upon 28 U.S.C. § 1367 and Article I, Section 8 of the Pennsylvania Constitution.

3. Plaintiffs have proven that they engaged in activities protected by the First Amendment.

4. Plaintiffs have failed to prove that they were retaliated against by the defendants for their engagement in First Amendment protected activities.

5. Defendants have proven that they would have taken the same actions and made the same decisions even in the absence of the plaintiffs' engagement in First Amendment protected activity.

6. Plaintiffs have proven that they had a property interest protected by the Fourteenth Amendment's substantive due process clause.

7. Plaintiffs have not proven that the defendants' conduct was arbitrary, irrational and/or shocked the conscience.

8. Plaintiffs have proven that the issuance of a citation for Grimm Brothers Realty's refusal to consent to a warrantless inspection of 857 Cherry Street on October 11, 2000 violated Grimm Brothers Realty's rights under the Fourth Amendment.

9. Defendant O'Donnell has proven that a reasonable code enforcement official would not have known that issuing the October 11, 2000 citation would violate a clearly established constitutional right. O'Donnell is therefore protected by qualified immunity.

10. Plaintiffs have failed to prove that the condemnation of 837 Swede Street was an unreasonable seizure of their property in violation of Article I, Section 8 of the Pennsylvania Constitution.

11. Plaintiffs have failed to prove that the condemnation of the basement of 857 Swede Street was an unreasonable seizure of their property in violation of Article I, Section 8 of the Pennsylvania Constitution.

12. Plaintiffs have failed to prove any damages.

13. Plaintiffs are not entitled to relief.

An appropriate order follows.

### ORDER

AND NOW, this 7th day of March, 2003, in consideration of Plaintiffs' Proposed Findings of Fact, filed December 30, 2002, Plaintiffs' Memorandum in Support of Proposed Findings of Fact, filed December 30, 2002, Defendants Charles R. Sweeney, and Thomas M. O'Donnell's Response to Plaintiffs' Proposed Findings of Fact, filed Jan-

uary 6, 2003, Defendants Charles R. Sweeney, and Thomas M. O'Donnell's Proposed Findings of Fact, filed January 6, 2003, and Defendants Charles R. Sweeney, and Thomas M. O'Donnell's Brief in Support of Defendants' Proposed Findings of Fact, filed January 6, 2003, and the evidence and exhibits presented at trial, and consistent with the foregoing Memorandum, we hereby ORDER as follows:

1. JUDGMENT is ENTERED in favor of the Defendants on all claims.

2. This case is closed.